Judge Coalter.
The bill filed in this case, for the common-' wealth, ou the relation of Charles Mysm Thurston, cscheator of of the county of Frederick, charges, that Thomas Shyan Martin, formerly of that county, died possessed of a large real and personal estate, which real estate consisted of lands in ¡losses *118 sion and reversion; that, prior to his death, knowing that he had no relations in this country, but that they were' all aliens, and incapable of inheriting his said real estate in the event of his dying intestate, he consulted with eminent lawyers to ascertain how he might most effectually secure his estates to his three sisters, who were and still remain British subjects, and who have never been within the limits of this commonwealth ; that, in order to effect this intention of devising his said estate to his sisters, he made his will, in which, after other devises and bequests, is the following clause ; “ I give and devise all the rest of my real “ estate, in possession, reversion and remainder, in the com- ‘ monwealth of Virginia, and also the aforesaid one thousand “acres of land, if Betsy Powers aforesaid, does not survive “ me, unto Gabriel Jones, of Rockingham, Robert Mackey, of “ Winchester, and John S. Woodcock, of Frederick, gentlemen', to “ be sold by them, or the survivors, or survivor of them, at “ such time, in such parcels, and in such manner, as they, or the survivors or survivor of them ,shall judge most advanta- “ geous; and the money arising from such sales, and the rents “ and profits of the said lands, which may accrue before the “ sales, I give and bequeath to my sisters herein after named; “ that is to say, Frances, Sybilla, and Anne Susanna Martin, to “ be equally divided between them, if alive at the time of my “ death, and if either be then dead, to the survivor then alive ; “subject, nevertheless, to the payment of my just debts, and “ of the legacies bequeathed to my executors as aforesaid.” And, by another clause of said will, he bequeathed as follows : “ I give and devise the sum of fifty guineas to each of my exe- “ cutors herein after named, to be paid out of the property de- “ vised to be sold;” and that by his said will, he directed alt his estates, real and personal, except the 1000 acres bequeathed to Betsy Powers, and except, also, his watch and his plate, to be sold by his executors. The bill then charges, that Mackey and Woodcock qualified as executors; and that the personal estate which came to their hands, exclusive of legacies, will far exceed the debts due from the estate; that, although it appears to have been the intention of the said Martin to evade the commonwealth's right by escheat, had he died intestate, that yet, from the whole structure of the will, a trust is created, of which trust the commonwealth asks the execution in its favour; that *119 the executors, though notified of the claim of the commonwealth, have sold the greater part, if not the whole, of the lands, contending that the same were devised to them in fee, and express an intention to remit the proceeds to the alien sisters of said Martin.
The bill then prays a discovery, &c., and an execution of the trusts in favour of the commonwealth, and general relief, &e. To this bill the executors demurred after overruling, and again re-instating which demurrer, the chancellor at Staunton finally dismissed the bill.
When the demurrer was reinstated, it was coneeded by the attorney tor the commonwealth, that he did net seek to disturb the purchasers of the lauds ; but that the object of the suit was to recover the monies for which the lands were sold ; whereupon, the court authorized the executors to proceed to collect said monies, and to hold them subject to its future order.
The question thus presented to us, in which the rights and interests of the commonwealth on the one side, and of alien Claimants (undeF the will of a brother) on the other, come in collision, is one of peculiar interest, dr!k.>cy and importance ; and is one in which the court will have no inclination to interfere, to the prejudice of the aliens, unless impelled thereto by the requisitions of the law, bottomed on that principle of self preservation inherent as well in society as individuals; that principle which prohibits an alien from holding the soil and territory of our country, to which he holds no reciprocal allegiance.
The importance to society of that power which is given to individuals of appointing the future heir of their earthly possessions, seems to be universally admitted. Those affections which are so necessary to unite and preserve the human family in a state of civilization, and those exertions, whether bodily or mental, which tend to the convenience, comfort and ornament of society, depend much on the power of appointing who shall enjoy the fruits of those exertions after the death of the present possessor. To impair this power, therefore, is to lesson the motives to industry, frugality, and every social virtue, and in fact to diminish those endearing affections which so *120 vitally interest as well the happiness 'as the existence of the social state.
Hence it happens that all wise, governments have carefully preserved to individuals the right of perpetuating to their friends those enjoyments which they have toiled to acquire for themselves ; and are solicitous, by law, to cast the inheritance, where the proprietor dies intestate, on those supposed to be most dearto him. No government has gone farther than ours, in hunting out these objects, being desirous to succeed only where none such can be found, and not to step in before any, wherever they may reside, except to prevent the acquisition, by aliens, of the soil of our country. Nay, even as to these, the government has evinced a policy highly magnanimous and liberal, not only by the general law of descents, which provides, that in making title by descent, it shall be no bar to a party that any ancestor, through whom he derives bis..descent from the intestate, is or hath been an alien, but by surrendering the rights of the state, in many cases, to such as were aliens at the time of the descent or devise, on their becoming citizens; as is manifested by many private acts of assembly for that purpose ; thereby evincing that the principle of self-preservation, not. the enriching of her treasury, is the sound policy of the state.
The society then imposes no restraint on h.er citizens as to the final disposition of their acquisitions, provided it is done in a way not to endanger the community; the next of kin, whether alien or citizen, will succeed, as distributee, to the persona] estate, or will take it as legatee ; and the question in this case is whether, under the will above recited, the real estate, the soil of the country, passed to aliens, or merely a personal bequest ?
The,bill admits that the testator knew they could not take it as real estate, and that he took advice how he might safely gratify his friendship for them without depriving himself of a home during his life, or violating the above principle of our policy and laws. He might have sold his real estate to a citizen, might have taken a mortgage on it to secure the purchase money, which he might have bequeathed to Ms sisters. This would have occasioned no injury to the state. He wishes,' though, to enjoy it during his life, and that the same thing *121 rfiould be done, by his executors, after bis death, which he might thus have done in his life time; and therefore he devises the fee to his executors, who were citizens, with power and directions to make such sale, and to pay over the money.
Was such act and intention wrong, or injurious to society ? This devise vested the fee in citizens, who became tenants of the freehold, as purchasers, the descent being broken by the devise. The executors sell to other citizens, who become tenants of the freehold, receive the purchase money, and are about to remit it to the alien legatees, when the commonwealth steps in to claim it. They are, with good fat it:, performing the will of the testator, according to his intentions ; but the commonwealth says, there is another way of executing this will, or, rather, there is a principle of equity applicable to legacies of this description, which, though it will violate the clear intention of the testator, and rests also on the election of the legatees, which they have not made, and which they cannot now make, as the lauds arc sold, yet, as it is said they could have made it, and by doing so have defeated their own rights, and given title to the commonwealth, the intention of the testator must yield to this principle. This alleged power of suicide must be considered, by a court of equity too, ¿s an act of that kind, and so this estate be vested in the commonwealth.
What is this principle of equity, which is to overturn the great and leading doctrine, in regard to wills, that they shah he expounded and carried into effect in that way which will best street the intentions of the testator ; and which, to enable the commonwealth to claim in this case, roust also proceed o>, the supposition that that which ought net ¡o be done, and which, in ibis case, cannot now be done, has been done.
In the case of Fletcher v. Ashburner.(a) and various Giber cases, (b) i< is said, that nothing was better established than this principle, that money directed to be employed In the par-chase of land, and land directed to be sold and turned lato money, are to be considered as that species of property into which they are directed to be converted ; and this, in whatever manner the direction is given; whether by will, by contract, marriage article, or otherwise. The owner of the fund may make land money, or money land. The cases establish this rule universally. If any difficulty has arisen, it has arisen from
*122 special circumstances, as in cases where lands have been directed to be sold, and some part of the disposition has failed, so that something has resulted to the heir at law. It is, also, an established principle, that, if the party having such fund dies, it will go to his real or personal representatives, as money or land, according as he himself would have taken it; (a) but this rule of considering money as land, or land as money, will aot i apply if the special purpose for which the conversion is to be . made fail; neither does it apply if the effect would operate an es-cheat. (b) AH this proceeds on the principle that equity looks upon things agreed to be done, as aetuaily performed; (c) but it is to be remarked, that nothing is looked upon in equity as done, but what ought to be done ; nor will equity consider things in that light in favour of every body, but only for thosb ’who had aright to pray it might be do.ie.(d) These I understand to be the general and established doctrines. A farther rule in equity has been also adopted, and engrafted on these, and which was intended to promote the benefit and convenience of the cestui que, trust; which is this : — that, where money’ is directed to be turned into land, or vice versa, the person entitled to it may elect in which way he will take it, as money, or land ;(e) and very slight evidence of his intention, by acts 'done, will be sufficient(f) and when he has once signified that intention, be is bound by it. An infant, however, cannot elect; or, where an estate is directed to be sold, and the money divided amongst several persons, none has a right to say that any part shall not be soid.(g) So, too, where it appears to have been the intention that a sale or purchase, as the case may be, must take place at all events, there a court of equity, whose business it is to aid the intent of the party, will not permit the character thus impressed on the property to be changed by election. (h)
It is contended, on the part of the commonwealth, in this case, that the legatees, according to these principles, had a right to unite in electing to hold this land, as real estate ; and that tbeir capacity to do so, although they have made no such election, makes the will operate as a conveyance to them of aa equitable title to real estate, which, as aliens, they are incapable of holding, and in consequence of which, the commonwealth takes the trust. And, though a sale has actually taken place *123 in this case, and the land is converted into money, yet that circumstance will not vary the rights of the commonwealth. And the case of Roper v. Radcliffe, is mainly rc-Ih-d on to establish this pretension.
That ease was decided on the British statute which disables papists from purchasing lands, and which declares that, all and singular estates, terms, and any other interests or profits whalsenorver, out of lands, to be made, suffered or done to, or for the use or behoof of any such person or persons, or upon any trust or confidence, mediately or immediately, to or for the benefit or re-¿if of any such person, shall be utterly void, &c.
John Roper, having lands in fee, conveyed them by deed to William Constable, and others, in trust to sell, and, out of the purchase money, and rents ’till sale, to pay off certain debts and incumbrances, and the overplus to be paid as the said Roper, by any attested writing, or by will, should appoint. Roper then had an interest in this land still left in him, which, had he died intestate, or without, making any appointment thereof by deed, would have descended to his heir at law as a resulting trust ; as a real trust interest descendible. He, however, made a will, by which, after reciting the deed and the power in him over the surplus, he bequeaths several pecuniary legacies, and the residue of ail his real and personal estate he gave to William Constable and Thomas Raddffc, who were papists. They bring their bill against Edward Roper, the heir at law of John Roper, the testator, and the trustees, to have the trust estate sold, &c. Edward Roper, the defendant, contended that, as heir at law, he was entitled, Radclffe and Constable being papists, and incapable of purchasing ; and that the devise was there» fore void. The lord chancellor, assisted by other judges, decided that the devise of the surplus, after debts and legacies, was good, notwithstanding the act; the surplus money being a personal interest in them, and not made void, either by the words or intention of the statute. Roper appealed to the house of lords, where the decree was reversed principally for the reason that, if the devise of the residue to the plaintiffs was good, they would in equity, be entitled to pay off the debts and legacies, and, when that was done, beep the estate, which would be a means of evading the statute, and enabling a papist to take an estate contrary to the intention of it. (a) It will be *124 found by a full examination of this case, and of the reasoning of the lord chief justice Parker, (whose opinion is the only one given at large,) as reported in 9 Mod. 18LS that the strong and comprehensive words of the statute had great weight; “ all estates, terms, and any other interest or profit whatever “ out of lands,” &o. — And, the lands not having been then turned into money, the question now is, says he, whether this trust, this right to the surplus, be within the act; that is, whether it be an hereditament, estate, or any interest or profit whatever out of land. He proceeds to say, had this even not been a surplus, but a certain sum appointed to be paid out of these lands, it would have been an interest and profit out of land, and so clearly within the act. Such an interest as this latter, though, it is admitted would pass to an alien, and now, by late opinions, would go also to a papist. But he proceeds, farther, to say, that this residue, remaining in John Roper, was so vested in him by the deed, as not only to be an interest and profit out of land, but such an one as was an hereditament and descendible to his heirs, it being expressly reserved to him and bis heirs, and would clearly go to Edward Roper, the heir at law, if the will was out of the way ; that it is a resulting trust in the heir, and, if not devised away, would have been assets by descent in his hands ; and that a devise of all his personal estate would not have passed this interest; but that it passes to the plaintiffs, if the devise is not void, as the residue of his real estate, in which ease they would take a trust in the land, 1st, as it v?as in John Roper, and 2d, as it would have been in his heir: and therefore it was, 1st, an hereditament; and 2d, a descendible trust in land. He then goes on to refute the arguments as to its being a descendible interest, and admitting it was not, which he denies, he still urges that it would be within the act; otherwise, it might be evaded : and I understand his opinion on this point, to be substantially this, that, if it is no purchase against the act, then a papist who can hold land in any way not prohibited by law, would take an interest in land, and after the court has declared the trust good to him, it would he too late to dispute with him about the management of what is his own.
This decision is considered as law, in England, as to papists, ffiereiy because it has been so decided by the highest tribunal. *125 not because the decision is satisfactory; but no judge is disposed to carry the doctrine an iota farther. If, then, there is a manifest difference between an alien and a papist, as to their abilities and disabilities, and also strong points of difference between that case and the present, Í see no reason why this decision should be extended so as to embrace the controversy before us.
In the first place, then, there is this distinction between a papist and aliens. The former is a subject, and can hold lands in i:ay w >y not prohibited by law. He can transmit them, forfeit them by treason, &c.; and if a devise of this kind to him is not void, he would come into a court of chancery to be permitted there to hold them by ejection, and so the policy of the statute might be evaded, as the mortmain acts had been evaded by suits and covinous recoveries, which the courts, presuming all recoveries just and lawful, would not construe within the law, and so the statute was evaded.
A devise, though to an alien is not void. The commonwealth does not come here on that ground. His election, if he could make one, to hold them as land, would, ipso facia, convert the bequest into land, which he then could not hold, (as the papist could, if the devise was not void,) but he would] then take for the commonwealth, as he would were he voluntarily to lay out his money in a purchase of land. The election of of the papist to hold as land will not give it to the heir at law, because that would he to make the devise enure, in a certain event, to him. The devise is either void, or not. If not, a ml the court so decides, it may then be too late to say to the pa pist, you shall not use as you please what is your own.
There is also a striking difference between these cases. It the case before us, the land has actually been converted into money, and that money alone is the subject of controversy. Now, if lands are charged with the payment of monies ami more than enough happens to be sold, there is no head of equity, as between the heir and personal representative, to consider this surplus of money as land, in which condition it ought to have remained, but they must take their rights as they find them. Why should not this principle also apply to the commonwealth ? In this case too there is no resulting trust in these alien legatees, or descendible trust Interest. Had *126 they, or either of them died, the day after the death of the testator, the bequest would have gone to the personal representative, not to the heir at law of such deceased party. Had they all been dead at the death of Martin, the legacies having lapsed, then, indeed, there would have been a resulting trust, descending on the heir of Martin, as to this residuum; but these parties clearly took a personal interest, and which would have gone to their personal representatives.
This case of Roper v. Radcliffe came under consideration in the case of Foone v. Blount, Comp. 467. Lord Mansfield says, concerning it, that, “ being a decision of the house of lords, we “ must be bound by it; though the judgment was against great “opinions, and not with the approbation of the bar; and, “ though it must govern parallel cases, yet, being so little satis- “ factory, it ought not to be carried farther. The argument of “ lord chief justice Parker, (he says,) is very able, but not con. “ vineing to him. He says, if such devise is not within the “ acts, the devisee might make his election to pay off the debts “ and keep the land, by which means the statute would be evaded ‘‘ but the defect of the argument lies here, and the objection “ may be answered thus ~no; — a Roman catholic shall not “ make his election; because there is a law which says that» “ being a papist, he shall not take the land.” “ Something\of “ this kind,” he observes, “ was said in Bowes v. Lord Shrewsbury.’(a) So he says, “ in the common cases, where money */ \ / * “ is given to a charity to be laid out in land, or government “ security, though a common person may, in a like case, elect to take the land, the charity cannot; because it is unlawful _ “ and therefore, though the election be given, yet, one alter’ “ native being lawful, and the other not, a court of equity says, “ you shall do that which is lawful.” If, however, chief justice Parker is right in saying it will be too late, after declaring the devise good, to say, in case of a papist who could not forfeit it by such act of election, that he shall riot elect, yet the case is different as to an alien. If his act of election would, ipso facto ^ forfeit his estate, ought a court of equity to permit such act to be done, unless, indeed, they were fully satisfied that the party was in his right senses, and was fully advised of the consequences of such his act» as, prima facie, it would be the act of a lunatic, against which that court ought to guard him ? Ik *127 this point of view, I think an alien ought not to he considered aa having an election. The election given to a citizen is adopted on the principle of extending & substantial benefit to him: — why will equity suppose this power in an alien, not as a benefit to him, but merely for the purpose of forfeiting his estate; and that, too, without even giving him the election to take it m the way he can,- — as money, not land ? Why throw this power upon him, if he has no right to exercise ii for his benefit ? It is no power of election, if he can elect but one way. If a citizen dies, leaving no heirs but aliens, the law does not throw the inheritance on them, in order that the commonwealth may take it from them; because the law will do nothing in vain. The commonwealth, in that case, takes, as (hough these heirs were not in being. Why then shall equity do so vain a thing, as to convert an useful principle of equity, as cestuy que trusts generally, into an engine of destruction as to alien cestuy que trusts, by supposing an election in them, which they are not permitted to exercise ? If they are supposed to have the right of election, surely they ought to be permitted to elect at their peril; and, if so, the election in this case is past, as the lands have been sold, and the only question is about the money.
It is said, this right of election has become a rule of property ; but I rather consider it a rule of equity, not affecting the nature of the estate, but founded in the convenience of the parties. Why encounter the expense and trouble of a sale, and oblige the cestuy que trust, if he wishes to hold the land, to purchase it in '{ It was to avoid this circuity that courts of equity permitted him at once to elect to hold it as land, on paying off the charges upon it. If it is a rule of property; though, I apprehend it ought to fix the character of the estate from the death of the testator. But an infant cestuy que trust cannot elect, or, if he does, his election is void, and the pro perty goes, as land or money, according to the stamp which la placed upon it by the will or agreement. It remains personal in this case, until the time of election. Suppose a legatee of this kind had died intestate, the day after the testator, leaving a husband, and a child or children. The husband, as her personal representative, would take this bequest as personalty 5 but, having thus acquired a right to the money, he then comes *128 iu and elects to pay debts, &c. and keep the land; and, if there is no objection to him as an alien, I see no reason why he should not be permitted to do so : — it then, and not Hill thm^ becomes land, and that after having passed, in the first instance, as personalty. But, suppose money is directed to be laid out in land, in Virginia generally, or in a particular tract, and devised to an alien. This, in case of a citizen, before election to take it as money, would be a real trust interest descendible to his heirs. Would a court of equity restrain the alien from electing to take this as money, or compel the trustee, notwithstanding such election, to lay it out in land, so that the commonwealth might take it ? Or would she take the money as land ? According to the principles of the case of Walker v. Heme, 2 Vesey,jr. 170, I think a court of equity would not be justified in doing so, or in giving the money to the commonwealth; indeed, the rule which I have above referred to, says that this shall not be considered as land, if that would operate , an escheat.(a) Why then will it convert a mere personal trust interest into laud, for the benefit of the commonwealth, and make it that which it was not originally, merely for the purpose of escheating it ?
In the case of Hart v. Knot, Comp. 43, the testator devised as follows: — “ In case my personal estate shall not be sufficient “ to pay all my debts, legacies, &c. I hereby give to M. K. and “ W. R. and their heirs, all my Sands and estates at Alder- “ church, upon trust to sell the same, «fee. and the money aris- “ ing to go and be applied towards making good any such defi- “ ciency;” and, after subjecting lands in reversion to the same purpose should the lands so devised also prove deficient, he concludes; “ and, lastly, all the rest and residue of my real and “ personal estate whatever, I give to my wife, and her heirs,” & c.
AH the debts and legacies were paid out of the personal estate ; and so no occasion to call in the land. The question was whether Hart the heir at law was entitled to recover the land at Alderchurch from the widow.
It was contended he was, because the testator did not intend to comprise these lands in the residuary clause, they being devised to the trustees.
*129 Lord Mansfield says ; “ There are two lights in which it “ may be considered. First, whether, in the event which hap- “ pened, there is any devise of the premises ? If not, they go, 81 by the residuary clause, to the widow.” And he was of opinion, “ they were not devised to the trustees, for the testator 81 says, in case my personal estate is deficient, then I devise, 88 But, his personal estate was more than sufficient; there,» 88 fore, he did not devise.” 88 Secondly, he supposes the per- “ sonal estate a little deficient, in which case, he says, the de88 vise would have taken effect, and then there would have 88 been a resulting trust for some body, and, if the trustees had 88 paid this charge, they would have become trustees for the 88 person entitled to the surplus; and he admits that, if that “ person was the heir at law, the mere legal estate in the trua88 tees, for his benefit should not be set up by the widow against 88 himand so he would be entitled to recover. 86 But whe88 ther he should he considered the cssluy que trust, or not, turns 88 singly on the construction of the will. It is a trust original* 58 ly, and, in substance, a charge on land, which is devised, 88 subject to raise by sale or mortgage as much money as may 88 be wanted. It is therefore, in substance and equity, a devise 88 of a charge upon the estate, which may be discharged by pay-88 ment of the incumbrance, or, if not wanted, will rest in the 88 s ’-me state as if it had not been made subject to such incum - 88 brance 5 and the words,8 all tibe rest of the land? necessarily 88 make it come within the residuary clause. If it had been 88 sold, the residue of the money must go to the person to whom, 88 under the residuary clause, the land itself was to go, subject “ to such payment; therefore in either case the widow was 88 entiiled.”
The real case decided, then, was that the residuary devises took this land; — the devise to the trustees, under the event which happened, never having taken effect in them. The case supposed though, and which might have happened, to wit, there being a balance of debts and legacies to pay, lord Mansfield says would turn 011 the construction of the will, according to which he says he would have considered it a devise of the land to her charged with this balance.
If this is (o be considered a decision on (lie doctrine of elections, and to extend beyond that case, (which was a real trust; *130 descendible to the heir as a resulting trust, or going to the residuary devisee as land,) to the case of the will before us; it would result in this; that, whenever lands are devised to executors or trustees to be sold, the legatee of the residuum shall be considered a devisee of the land itself before election, and immediately on the death of the testator, and in case of the infancy, or on the death of such legatee, before election, it would descend as land, which would be contrary to all the authorities above referred to: for if, before election, it is an equitable interest in the fee simple, then, on the death of the legatee without any act of election, it would go to his real representative; but all the authorities are against this : — it will only go to the real representative in consequence of some act evincing an election to take it as land. But, farther, if it should be considered as extending to these cases, and converting them into devises of land, it would also seem to follow that, the aliens taking land by this devise, the commonwealth ought to have pursued her usual remedy by office of escheat at law, and should not have come into equity. This broad doctrine', therefore, I do not consider tenable.
According to the general rule, an election exists ; but a general rule, to he .good, must have exceptions : this one has its exceptions: an infant cannot elect. So, if there are several legatees of a surplus, as in this case, no one can elect: he can only procure the others to join him in the election; and if that cannot be procured, he has no election, even if a citizen ; so that, before this sale, no one of these parties had an absolute right to elect. Why not say too, that an alien legatee shall not be considered as having an election ? To deny to him this right of election would be to support the principle of the rule which was adopted for the benefit of the cestuy que trust: for, if to suppose the election in him is to defeat a bequest in his favour, and contravene the intention of the testator, and in fact contravene the principles of the rule itself, why make such supposition ?
Before the doctrine of election was acted upon by the chancery courts, the course, I presume, was for the trustee to sell, and cestuy que trust, if he wanted the land, to purchase, pay the other incumbrances, and hold it in lieu of the residue of the purchase money. Had an alien cestuy que trust purchased 9 *131 fee would have taken for the crown, and, knowing this, he would not interfere, but claim the residue as money. But, when this principle was first acted upon, let us suppose three cases before the court; that of a subject claiming to elect; that of a papist claiming the execution of the trust repelled by the heir, who contends that this principle avoids the devise; and the case of the crown demanding an execution of the trust in favour of an alien to be made in its favour: what course would the conscience of a court of equity pursue ?
The court, thus circumstanced, may be supposed to say; as to the subject, this may be a beneficial rule of equity, and ought to be adopted as a general rule ; but we must see how it is to operate on these other cases. This principle, it is true, has always existed in the nature and propriety of things; but its propriety, as applicable to the nature of things, may not admit of its being an universal rule. At present, and according to the rule as hitherto understood, the papist and the alien can take this as money: shall we adopt the rule generally, so as to consider them as purchasers of an interest in or equitable title to real estate ? Or shall we say, that this rule, which is founded on the convenience and interest of the cestvy que trust, shall not extend to them ? If these cases were now for the first time to be decided, the interest of the papist, even in the case of a real trust descendible, would he protected on this ground, as appears by what is said, in recent adjudications, of the case of Roper v. Radcliffe; and had such decision taken place, it would have been an authority directly in favour of an alien, who, a fortiori, ought not to be permitted to elect; whilst, at the 3ame time, it would in no manner conflict with the decisions which, it is said, establish an interest in lauds where the election exists, as, without such right of election,, it is admitted no interest would exist. But say, that, as to the papist, the court at that day were divided; some judges thinking that he ought to be protected by denying him the right to elect, others thinking that, as he is a subject, and capable of holding lands in any way not prohibited by positive law, he might lay hold of this principle to evade the statute, for if the devise is not declared void, his posterior act of election will not make it so; yet, as that was not the case as it respected an alien, whose election, when evinced by any slight act, as inter *132 femsg with' tenants, taking possession of the land, &c., would ipso facto forfeit his estate, it would be time enough for the crown to claim when such election was made: or, (what 1 think would be the more liberal and reasonable ground of decision as to him,) the court might well say that, as the devise or bequest is in no event to be declared void, we will not suppose him to have an election to take what he cannot hold, as such supposition would contravene the very principle on which we are about to establish the rule, and is not forced upon us by the consideration that he may lay hold of it so as to evade the law imposing a disability on him to hold: he therefore will form a proper exception to the rule.
We might well doubt as to the propriety of the decision in the case of the papist, as applying the rule in a hard and unreasonable way as to him, but not as to the alien; there being a clear difference between the two cases; “ and judges, (says “ lord Hobart,) (a) ought to be astuti in finding out reasonable “ distinctions to unreasonable rules.” But why should we carry the case of Roper v. Radcliffe beyond the very point then decided, when it is admitted that the bigotry of the day carried the judges too far even as to papists ? That was the case of a real descendible trust interest, and admitted by lord chief justice Pratt to be much stronger than the case of a personal trust interest which this is ? His dicta and reasoning as to a certain sum to be raised by the sale of land have been since overruled ; and why ought his reasoning and dicta as to personal trusts to prevail? The policy of the state gives encouragement to aliens, who are permitted to purchase land warrants and survey lands, and are allowed two years either to become citizens, or to transfer the surveys. This boon is held out by the State to tempt foreigners to fill up our wilderness.
I have heard of no case within this commonwealth, or in any of the other States, of an escheat of a lease for years to an alien of arable land for cultivation, although I believe such leases are not unfrequent. Whether the courts would consider the common law of England, a country surcharged with inhabitants, and far from soliciting emigrations to it, as applicable, In this respect, to one remaining, even at this day, principally in forests, every where soliciting the ax of the labourer, the plough of the agriculturalist, and the ingenuity of the artizan, *133 or would restrain these and like privileges to land-jobbers and mercantile adventurers, — characters,—to say the least, — not more useful to the State, — may perhaps be a question worthy of consideration, should the commonwealth ever attempt to throw this obstruction in the way of the improvement of our soil and manufactures.
But the greatest interest in land which, I apprehend, it can be supposed a party, whether alien or citizen, takes, under a bequest of this kind, before election, is an equitable interest in land, of so slight a texture that it can be defeated, by the executor or trustee, at any moment, without even the notice necessary to a tenant at will, — an interest not in possession, the fee, with the possession and right of possession, being in others.
Before election, as is above observed, his interest in the land is not of such a nature as to pass to his real representative, as it would do after election made. It is a mere power to make it land, or let it remain money ; and, if he dies before exercising this power, its character is unchanged. This power, however, if it has fci;en considered, either at law or in equity, as giving any interesr in the land itself, will be found, I bi-'bive, to have been so considered, (the case of the papist excepted,) for purposes beneficial to the cestuy que trust, and in no case for the purpose of working an escheat, or for any other purpose injurious to him. The nature or character of this interest, however, appears not to he well understood or defined. It cannot be an equitable fee, until after election. It is not a lease for years; otherwise it would go to the personal representative as a chattel r?al, whereas he takes it as money. The commonwealth, though, does not ask to take it as a chattel real, but as an equitable fee in the h inds of the hacres foetus, who it is alleged cannot hold it. But, if it is not an equitable fee in his hands, but merely a power to make it such, and which power in this case even no longer exists, why will the court make it what it is not, for the purpose of working a forfeiture ?
Suppose a citizen wishes his real estate sold after his death, and that aliens shall have the money, and, for that purpose, devises it to his executors to be sold, and gives, a sum certain, say ten times the estimated value of the property, if it shall sell for so much, to he equally divided among aliens, and then gives the residue to his executors. This bequest would be *134 good on its face; but would it, in reality, be safer for tlie commonwealth than the present devise ? The executors in the case supposed may never sell. They know that a residuum is out of the question. They manage the estate, therefore, for the cestuy que trusts; put tenants in and out according to their directions; and a thousand acts which would amount to an election, and forfeit the estate in the present case, would not do so in that. The policy of the law might be evaded in a case of that kind more easily than in this; yet that, it is admitted, would be a good bequest to an alien.
The case then, as well as the reasons to support it, must be so strong as not to be escaped from, before I can consent that this shadow of a shade of title to' real property shall defeat a hequest, in its nature personal, until some deliberate act of the legatee shall make it more substantial. Nor do I see any difficulty at all, either as it respects the safety of the State, the justice of the case, or the authorities relied on in opposition, in declaring that an alien has no right of election in such cases. Let him purchase in the estate if be chooses to risk the consequences. Some such deliberate act alone, I think, ought, in this case, to subject him to the penalty arising from “ that pre- “ sumption of which he is supposed to be guilty,” (to use the words of judge Blackstone,) (a) “ in attempting, by an act of “ his own, to acquire any real property.”
But there is another case of disability to elect, which it appears to me ought surely to embrace this case; which is that, if the testator intended that a sale should, at all events, take place, there is no election.
This intention must be collected from the will, which, I apprehend, is to be taken in connexion with the situation of the testator, the nature of the property devised, and the condition of the objects of his bounty. (b) The testator was a citizen of this commonwealth, possessed large real estates therein, which was the great object of the devise ; and the legatees were his sisters, and aliens. The bill admits that he was apprized they could not take this estate as land ; and that he took advice how he might effectually secure it to them, so that they and not the commonwealth might have the benefit of it. If though, they could only take it as money, after a sale made by his executors, to whom he devised it in fee, and he intended they *135 should take, it follows that he intended a sale should certainly take place. In the case of Bowes v. Lord Shrewsbury, (a) noticed by lord Mansfield, as above stated, a papist, by marriage articles, previous to the disabling acts, covenanted to lay out money in land : the money was not laid out until the statute wras made: — the husband outlived the wife and all the children, and was sole survivor, and neither by deed, will, nor parol declaration, did any thing to vary the trust. Lord Shrewsbury, as his next of kin, took administration. Bowes, as his heir, claimed and fded a bill to have the benefit of the articles. But, as the statute put it out of the husband’s power to make it land, this was considered equal to his assent that it should remain money ; and the bill was dismissed.
It would swell this opinion, already much too long, to an improper and unnecessary length, to notice the other leading cases referred to on both sides. Suffice it to say, that I think them all reconcileable to the great principles for which I contend ; to wit, that the disposition of the testator’s property by this will may be sustained without cornprornitting the safety of the state ; and that it is the duty of courts, so far as they can consistently with that safety, and the rules of law, to give efficacy to such dispositions according to the intent of the parties ; having no right, if it can be avoided, to thwart, or turn aside the bountv of testators.
There is one ground of claim, however, to wit, the devise of rents, which must be noticed.
This clause in the will must be considered, either as a devise to aliens of the laud itself, or of some hereditament, lit fee, or for life, years, or at will of the executors; or it must be considered a devise of the lands to the executors, in trust, to hold the land itself, or some hereditament, for aliens, in fee, for life, years, or at will. If it conveyed the fee to the aliens, this clause would defeat the previous devise of the fee to the executors ; but the whole will must stand, if it can. In that case, too, the commonwealth would have, no business in u court of equity, as it would be a plain case of a devise of lands, or hereditaments escheatahle at law. But the commonwealth does not claim the land itself on this ground, nor does she say that any rents had accrued before the sale, so as to claim them now in a court of equity, on the ground that, the sale being *136 now made, she is deprived of her legal remedy to be let in» to the enjoyment of the land, and the perception of the rents until the sale, as an hereditament belonging to the alien until that time. The bill is entirely silent on this subject, and claims only to have the trust executed for the commonwealth where sales have not been made, and to have the proceeds of those that have been made ; admitting, in fict, that the legal title did not pass to the aliens. As to the latter, I think the will can not bear the construction, that it was intended to create a trust in the lands themselves, until sale, in favour of the aliens; but if it was so intended, still, if there is nothing to prevent the aliens taking the residuum after sale, the commonwealth, I apprehend, taking this trust under the will, could only claim the rents previous to the sale, not the whole value of the lands ; for, suppose the rents, before sale, devised to aliens, and the surplus of sales to citizens, the commonwealth could only claim the part devised to the aliens, asan hereditament which they could not hold; but the devise of the surplus would be srood.
In Co. Lift. 236 a., it is said that, where a man devises thai his executors shall sell his lands, there the lands descend in the mean time to the heir; and, until sale, the heir may enter and take the profits; but where the lands are devised to the executor to be sold, there the devise taketh away the descent;, and vesteth the estate of the land in the executor, and he may enter and take the profits, and make sale according to the devise. According to this authority, the executors had a right to receive the rents and profits until the sale, and then the whole value of the estate, whether arising from rents upon leases made by them, (which may be considered as sales for term of years,) (a) or from sales made of the fee, is first charged with the payment of debts, legacies, &c.; and the surplus, in one entire sum, is then given to the sisters. Had they attempted to make leases, or to distrain! they might have been opposed on the ground that they had nothing in the tenement.
Upon the whole, therefore, and from the best view I have been able to take of the case, I am of opinion that the decree should be affirmed.
*137 Judge Oaiíeiyíj. By the will of Thomas B. Marlin, his alien sisters Frances, Sybilla Martin, and Anne Susanna Martin are made residuary legatees of the surplus (after payment of debts and legacies) of the money arising from the sale of his lands, which he devised to trustees to be sold, at such times, in such parcels, and in such manner as they might deem most advantageous. The will also gives to his said sisters the rents and profits which might accrue before the sale.
The first question to be decided is, whether the Miss Martins took by this will any estate in the lands thereby devised; for, if the will gave them no estate in the lands, the commonwealth’s claim to the money arising from their sale can have no foundation.
If the decisions of the English courts, in cases parallel to this, be admitted to be authority, I consider this a very plain question.
In the great case of Roper v. Radcliffe, 9 Mod. 167;, it. was expressly decided by the house of lords, that a devise like that under consideration gives to the residuary legatee an equitable estate in the lands themselves. In that case, as in this, it was contended for the legatees, “ that lands devised for payment of debts and legacies are to be deemed as money.” But to this the house of lords answered and resolved, “ that though “ lands devised for payment of debts and legacies are to be i£ deemed as money so far as there are debts and specific lega» ft cíes to be paid, yet still the heir at law has an interest in a such lands, hy a resulting trust, so far as they are of value “ after the debts and legacies are paid ; and the heir at law may properly come into a court of equiiy, and restrain the “ vendor from selling more of the lands than what are mecesu sary to raise money sufficient to discharge the debts and le» “ gacies, and to enforce the decree to convey the residue to “ him ; which residue shall not be deemed as money, neither “ shall it go to the executors of the testator; Nay, the heir at “ law in such case may properly come into a court of equity, s£ and offer to pay all the debts and legacies, and pray a con» M veyance of the whole estate to him ; for the devisee is only í! a trustee for the testator to pay his debts and legacies. This tl is a privilege which has been always allowed in equity to a ® residuary legatee ; for if he come into court and tender what *138 “ will be sufficient to discharge all the debts and legacies, off “ pray that so much of the lands, and no more, may be sold, “ than what will raise money to discharge them, this is always “ decreed in his favour. Therefore, though lands given in “ trust, or devised for payment of debts and legacies, shall be “ deemed in equity as money, in respect of the creditors and “ legatees, yet it is not so in respect to the heir at law (of the “ testator,) or residuary legatee ; for in those cases they shall “ he deemed in equity as lands.”
This case has been very often referred to in subsequent adjudications; and its authority has never been questioned but uniformly acknowledged. As it is believed to have a decisive bearing upon the case now before the court, it is important to ascertain the point which it really settles. The object of inquiry was whether the residuary legatee in that case took an estate in the lands, and not whether the will gave Mm a charge on the lands, or a benefit resulting from them; for it was impossible that the decision should have been against the legatee, unless he was deemed to have taken an estate, equitable or legal, in the lands. It was not important to inquire whether the estate, which he took in the lands, was of such a character that, on his death, it would descend as real estate to Ms heirs, or be distributed as personal estate to his personal representatives; and we find accordingly that the house of lords said nothing as to the manner in which the interest of the residuary legatee would go after his death. An attention to the subsequent adjudications, in which this case of Roper v. Radcliffe has been referred to, will shew that it has never been considered as having decided any thing, on this latter point, viz. whether the interest of the legatee should go to his real or personal representatives; but it has never been questioned that it conclusively determined that the residuary legatee took an equitable estate in the lands. The opinion of the lord chancellor in the case of the Attorney General v. lord Weymouth and others, (a) fully justifies these remarks. The will there presented a case very much like this, so far at least as relates to the principle under discussion; and the chancellor, when speaking of the interest which the devisee took in the lands, says, “ As to the devise of the money arising from the sale, I 5t do not think it necessary, in order to determine this ques- *139 f fion, to say whether ii is to be considered as a devise of the “ land or money; but if the act of parliament did not stand u in the way, the person entitled to the residue might have " come, and prayed to have the land, in this court, instead “ of the money, and might have retained it as land ; and the “ rather as the testator has given the profits ’till sale, so that “ he has made them owners of the equity of the estate ; and “ therefore this is as strong a case as that of Roper v. Radcliffe." Many other cases might be referred to, as establishing the sarao point. I will mention one other on!,}, the case of *he King v. Willingham, (a) in which lord íSansfieud, who disapproved of the decision in Roper v. Radcliffe, (as will be seen in his opinion in Foone v. Blount, (b) and who therefore will not be supposed desirous to extend it beyond its proper limits, nevertheless refers to Roper v. Radcliffe as establishing a general principle, “ that a devisee of the surplus, ” arising from the sale of lands, after payment of debts and Ie- “ gacies, has an equitable interest in the lands themselves ; it. being in his option to pay the debts and legacies and keep “ the lands.” This opinion of lord Mansfield is very important, as it was uninfluenced by any consideration relating to the statutes against papists, and against conveyances in mortmain, but proceeds on principles of construction common to all residuary legatees whatsoever, it ia important, also, as it shews, as all the other cases do, that the interest of the devisee in the lands is made to depend not. on an election actually made by him to take the land, but on the option, which the will itself gives, of taking either the land or money.
Having thus established that the residuary legatees took an interest, an estate, in the lands themselves, \ do not deem it at all important to i nquire whether that interest be of ouch a character that, on their deaths, or the death of either of them, it would go to the real or the personal representatives of the deceased. The case of Doughty v. Bull, (c) (so confidently lied on by the counsel for the appellees,) and others of the same class, are, in my opinion, perfectly correct, founded on principles of equity, and not in conflict with any of the decisions for which I contend. But they have no bearing upon the case now to be decided. The rights and the disabilities of aliens have no reference to the technical distinction be *140 tween real and personal estate. A term for years, an interest in lands which is distributed as personal estate, is forfeited if taken by an alien. A mortgage, even, of a term for years, which is personal estate, both at law and in equity, becomes forfeited, if executed to an alien. The case of a mortgage presents a strong view of this subject. It is merely intended as a security for a debt; and the usual practice is for the mortgager to remain in possession of the land ; yet, because the mortgagee may sue at law and recover the possession, a mortgage made to an alien is forfeited to the commonwealth.
The policy of our law against conveyances to aliens, is not less strongly marked than is the policy of the English statutes against conveyances to papists, or in mortmain. The only difference is that, under the British statutes, the conveyances pre void ; whereas the conveyances to aliens are good, but enure to the benefit of the commonwealth only. There is no difference as to the principles of construction which should be applied for ascertaining the nature of the estates created by those conveyances of every description. I will add farther that, where the policy of the law is so strongly marked, judges should be astute to prevent its violation or evasion. — We should not, therefore, countenance devices like the present. In the words of the lord chancellor, in the case of the Attorney General v. lord Weymouth and others, before referred to, (substituting only the term alien for the term charity,) (c here is a gift of the rents and profits ’till a sale ; and how “ long it will be before a sale, — ’till what, time it will be post» * poned, — nobody knows : — no man has a right to compel the trustees to sell, if they pay the debts and legacies, but the f‘ charity (alien ;) “ and it being a devise of the rents and (l. profits, it is a devise of the lands themselves.”--Persons owning lands in this country might thus, by adopting this form of devise, and selecting their confidential friends as trustees, ensure to aliens the actual enjoyment of the lands for a very long series of years, if not forever, in direct contravention of the policy of the lavs'.
Upon the view of the case which I have thus taken, I am very clear that this will gave the Miss Martins an equitable fee simple in the lands ; and that being a trust estate, the cons *141 Hionwealth was entitled to have it executed in her favour, (a) The sale of the lands in this case; made no difference. The right of the commonwealth attached at the death of the testator, and cannot be defeated by subsequent acts of the legatees, or their agents. As well might it be couicnded that, if an alien purchase lands directly to himself, he may elude the claim of the commonwealth bv a sale before office found.
The commonwealth being entitled to the execution of the trust, she is entitled to the money arising from the sale made by the trustees, as she has consented to receive it.
On these grounds, I am of opinion that the decree of the chancellor is erroneous, and ought to be reversed.
Judge Roane. This is a bill brought by the attorney general* on behalf of the commonwealth, at the relation of the cseheator of the county of Frederick, against the executors and devisees of T. B. Martin, deceased, it states in substance, that the said T. B. Martin, being possessed of a large real and personal estate, and knowing that all his relatives were aliens, and incapable of inheriting his real estate, consulted with eminent lawyers to ascertain how he aiUdi't secure his estate to his sisters who were aliens : — that, in order to effectuate this intention, of devising his said estate to his said sisters, after giving to Betsy Vomers 1000 acres of land, and some small legacies, he devised as follows : — “ I give and devise all the rest 55 of my real estate, in possession, reversion, and remainder, in “ the commonwealth of Virginia, and also the aforesaid 1000 “acres of land, if Betsy Powers aforesaid does not survive me, “unto Gabriel Jones, Robert Mackey, and J. S. Woodcock, to he “ sold by them, or the survivors or survivor of them, at such K time, and in such parcels, and in such manner, as they or the “ survivors or survivor of them shall judge most advantageous, “ and the money arising from such sales, and the rents and “ profits of the said lands, which may accrue before the sales, I “ give and bequeath to my sisters herein before named; that is “ to say, Frances, Sybilla, and Anne Susanna Martin, to be ‘í equally divided between them if alive at the time of my “death; and if either of them be then dead, to the survivor “ then alive ; subject, nevertheless, to the payment of my just *5 debts, and of the legacies bequeathed to my executors as afore- “ said.” That, by another clause, he ^ave 50 guineas to each *142 of bis executors, to be paid out of the property devised to be sold : that by his will he directed all his real and personal estate, except the 1000 acres aforesaid, and his watch and plate, to _be sold by Jones, Woodcock, and Mackey, whom he also appointed his executors : — that Woodcock and Mackey qualified as executors, and have proceeded in the execution thereof s that the personal estate which came to the hands of the executors will far exceed the debts due from the estate: — that it appears that Martin’s object was to evade the commonwealth’s rights of escheat; and that, from the whole structure of the will, a trust is created, of which the commonwealth asks the execution in its favour: that the executors and trustees, though warned of the claim of the commonwealth by an actual inquisition of escheat, have sold a part if not the whole of the land, and express an intention to remit the proceeds to the devisees, the testator’s sisters. The bill then demands a discovery of the property, and of its disposition, and prays that the executors be decreed to perform the trust in favour of the commonwealth, be injoined from remitting the proceeds of the sales of the lands, and for farther relief.
The executors filed a demurrer to this bill, which was first overruled and afterwards re-instated by the chancellor, who also directed the executors to collect the money arising from the sales of the estate, (on a suggestion that the plaintiff would receive the money arising from sales of the land,) and retain it, subject to the future order of the court; and, afterwards, he sustained the demurrer, on the ground that it was a devise of money, and not of lands, and decreed the bill to be dismissed $ from which decree an- appeal was entered to this court.
While it must be admitted that aliens are not competent to take and hold lands by devise, it is equally clear that they are competent to take personal property ; and if personal property is granted or devised to them, or land passing as personal property, the disposition thereof cannot be vacated or avoided in' consequence of any previous intention in the devisor or grantor to evade the provisions of the laws of alienage. The question will merely be, whether it is real or personal estate which is granted. The intention of the testator in this case, therefore, as stated in the bill, and admitted by the demurrer, proves nothing against the right of the appellees, if the estate granted hr *143 personal estate ; if, on the contrary, it be real estate which is granted, that intention only fortifies and comes in aid of tht general principle inferrible from a grant thereof to aliens, and makes it more clear that the policy of the law which forbids them to hold such property, was intended to be evaded. I may therefore throw this admission out of the case, and consider ii as if the demurrer had not existed.
I will begin by saying, that courts of equity now consider a trust estate, either when expressly declared, or resulting by necessary implication as equivalent to the legal ownership, governed by the same rules, and liable to the same chargcs.(a) Again, a trust is defined to be a right to receive the profits oí the land, and to dispose of the land in equity.(b) The question in this case, then, is, whether the devisees in question, but for the impediment of being aliens, would have taken the land itself, and not its proceeds; whether It was a real or personal devise in their favour. Fortunately, the English books abound in cases, which, in my apprehension, leave no manner of doubt ;:n»n the ¡subject.
As (In- great case of Roper v. Radcliffe,(c) is In principle decisive of the ease before us, Í will endeavour to give a brief statement of it.
In that case, lands were conveyed in 1703, to A., B. and C., and thrir heirs, in trust to sell the same, and, out of the money to be raised by such sale, and out of the rents and profits until sold, to pay 4000Z. due by mortgage, and the surplus tobe paid 10 such person, or persons, as the testator should by will appoint, and, afterwards, by his will, he devised the residue of all Ms real and personal estate to A., B., C. and D., and their heirs and assigns, and made them joint executors, and by an after codicil devised all the remainder to liaddiffs and Constable, two of his executors. These two executors filed a bill against the trustees, &c., to have the lands sorm, and an account of the profits, and the surplus to bo equally divided between them. The answer insisted that the plaintiffs were papists, and incapable of purchasing lands by the statute of 11th and 12th Wm. 3, ch. 4; and that one of the defendants is the heir at law, and a protestan!. The opinion of four judges, and the master of the rolls, in opposition to that of chief justice Parker, was, that the devise of the residue was a good *144 devise, for that the surplus money was a personal interest iti them, and therefore the devise not void by the statute. On am appeal to the house of lords, this decree was reversed, July 11th, 1713, by a great majority of the lords, six judges being also for reversing, and five against it ;(a) and it was resolved by them, “ that so much of the decree as declares that the “ residue was a personal interest should be reversed. ”(b) We are informed, in 9 Mod. 167, more particularly, (hat it was resolved by the house of lords, on this appeal, that, although lantjs devised for the payment of debts and legacies are to be considered as money, so far as there are debts and specific legacies to be paid, yet the heir hath an interest therein by a resulting trust, so far as they are of value, after the debts and legacies are paid, and may come into equity to restrain the executors from selling more than is necessary for debts and legacies, and enforce the devisee to convey the résidue to him, which residue shall not be deemed as money, nor shall it go to the executors of the testator; or he may pray a conveyance of the whole land, offering to pay the debts and legacies, for that the devisee is only a trustee for the testator to pay bis debts and legacies; and that this is a privilege always granted to the residuary legatee ; for, if he comes into equity, and tenders what is sufficient for debts and legacies, there shall be no sale ; and so, only pro tanto : it was therefore resolved that, although lands given in trust, or devised for payment of debts and legacies are deemed as money in respect of creditors and legatees, yet it is not so as to the the heir or residuary legatee, for in those cases it shall be considered as land: and, if so, then, in the principal case, the residue being devised to papists, shall be deemed; lands, and consequenlly a purchase within the act: for which reasons the decree was reversed by the house of lords.
This decision by the house of lords has been often recognized and admitted by the courts in England, and has never been departed from. In 2 P. Wms. 10, Hill v. Filkin, it is said by the lord chancellor, that the case of Roper v Radcliffe must not be now disputed. In Davers v. Dewes, 3 P. Wms. 46, it is held! by the chancellor, “ that the point had been settled in Ihe case “ of Roper v. Radcliffe in the house of lords, ;.fier so solemn a “ debate as ought to render it conclusive to all the courts of « Westminster; that, accordingly, several subsequent resolu- *145 “ lions had been made pursuant thereto, and to recode from il “ would create great confusion and that, “ as the devisee o! “ the Surplus might, in equitys on paying the debts, &c., elect s< to take the land and prevent the sale, it was therefore held tc “ be a purchase of land under the act.” In Carrick v. Errington, (a) the case of Roper v. Radcliffe was also recognized and admitted ; and the decree was also affirmed by the House of Lords.(b) So, in 2 P. Wms. 4, the decree of reversal in the case of Roper v. Radcliffe, is considered as having settled the Lam on this subject. In the case of th ("Attorney General v. Lord Weymouth, to be presently more particularly noticed, the decision in Roper v. Radcliffe is also unequivocally admitted.
In the case of Rex. Wivelingham, Dougl. 770, Lord Mansfield mentioned the case of Roper v. Radcliffe to show “ that the devisee of the surplus arising from the sale of lands after “ payment of debts and legacies, has an equitable interest in the £i lands themselves, it being,” (or because il was) “ in his option S£ to pay the debts and legacies, and keep the land.”
These are some of the decisions, which shew that the law. as laid down by the Lords in the case of Roper v. Radcliffe, is considered as settled, and cannot be departed from.
It is true, that, in the case of Foone v. Blount, (c) Lord Mansfield is reported to have expressed some dissatisfaction with the decision in Roper v. Radcliffe ; but that is of no importance : 1st, because being the case of a Papist creditor, and not a Papist residuary legatee, the decision given in this case conformed to that in Roper v. Radcliffe, and was in nothing opposed by it; and, therefore, it was rather extra-judicial in that judge to go out of hia way and find fault of the decision on a point not then before the court : 2d!y, because in his opinion, he admits that if the decision in Roper v. Radcliffe, was parallel to the case before the court, “ it being a decision by the “ House of Lords, we must have been hound by it.” He, also, in a subsequent part of his opinion admits the law to be settled by thal decision, as it relates to a devise of the Surplus ; the case now before us : And, Sdiy, because, in the before mentioned case of Rex v. Wivelingham, five years afterwards, this same judge quoted and relied upon the case of Roper v. Radcliffe., a**having settled the Law upon the subject,
*146 iu principle, also, and almost in terms, the before mentioned case of the Attorney General v. Lord Weymouth, (a) is similar1 to that of Roper v. Radcliffe, and equally decisive of the case before us. In that case, Sir J. James, in 1740, devised “ to A., “ B. and C., his executors, their heirs and assigns, for the use of “ them, (heir heirs and assigns, all his manors, &c., and all his “ real estate, in trust to sell and dispose thereof as soon as might “ be conveniently done after his death, and to pay all the monies ‘‘ to arise from that sale, and the rents, issues and profits, in the “ mean time, and until such sale, unto such person or persons, “ and for such uses as he should thereafter give and bequeath “the same;” and, after giving several legacies charged on his land in aid of his personal estate, he gave the monies arising from such sale and the rents and profits, in the mean time, and until such sale, to A., B. and C., in trust to pay one half to Bethlehem Hospital, and the other to St. George’s Hospital. A bill was brought by the Attorney General, at the relation of the hospitals, against the Trustees and Lord Weymouth and others, heirs at law; praying the estate to be sold, and the money; and rents and profits, to be paid to them, &c. Lord Weymouth pleaded the statute 9 Geo. 2. (mortmain act:) and, by the Lord Chancellor, — “I will not encourage persons to try theexperi“ment of leaving their lands to Charities in this manner, when “ there is a mode of doing it pointed out by the statute; viz., “ by deed. The provision of the act is, that no lands, nor “ personal estate to be laid out in the purchase of lands, shall be “ given, granted, aliened, limited, released, assigned and trans- “ ferred, or appointed, or any ways conveyed, or settled upon “ any person for any estate or interest, or any ways charged or “ incumbered, &c. in trust for any charitable uses whatsoever.” “ This,” adds the Lord Chancellor, “ is a gift of the land itself. “ It is a gift of the rents and profits until a sale; and how long it “ will be before a sale nobody knows. Being a devise of the rents “ and profits, it is a devise of the land itself. If this act of par- “ liament did not stand in the way,” (as does the disability of alienage in the case before us,) “ the person entitled to the “ residue might have come in, and prayed to have the land, in “ this court, instead of the money, and have retained it as lands ‘‘ and the rather as the testator has given them the profits ’till 56 (he sale, so that it made them, in Equity, owners of the es» *147 ** fate, and, therefore, this is as strong a case as that of Roper v. Radcliffe.”
So, in the case of Hart v. Knott, Corvp. 43, where the testator devised lands in aid of his personal estate, in trust to be sold to pay his debts, legacies, and funeral expenses; and all the rest and residue of his real and personal estate to his wife, her heirs, executors and administrators; the personal estate being sufficient, it was held that the lands, devised in aid, passed to the wife by the residuary clause. It was resolved by Lord Mansfield and the Court, in that case, (which was Ejectment brought by the heir against the widow and devisee,) that it is, in substance and equity, a devise of a charge upon the estate, which may be discharged by payment of the incumbrance upon it, or, if not wanted, (as was the case in that case, as in this,) will rest in the same state as if it had not been made subject to the incumbrance; that is, it would remain land. They also held, that, if the land had been sold, after payment of what was wanted, the rest of the money must go to the person to whom, under the residuary clause, the land itself was to go ; and the postea was delivered to the defendant, the widow.
These cases are conclusive to shew that, although a devise of lands to be sold, &c. is to be considered a personal interest as it respects creditors and specific legatees, it is considered as land in relation to the heir and residuary legatee; and that where none of it is wanting to pay debts and legacies, (which the demurrer admits to be the case in the case before us,) it may be retained as land, against the heir,- even in a Court of Law: in other words, it will, in that event, remain land.
I will add that, although this doctrine of the law is said to have arisen from the power of electing to take it as land, no such election is necessary to be actually made to perfect its character as land; nor is the doctrine varied where the devisee Is disabled to take land, and consequently to make the election, by being a Papist, or a Corporation within the meaning of the statutes of mortmain, as the before mentioned cases clearly shew. The case of the Attorney General v. Lord Weymouth, clearly admits that no election need be made, in stating that the election of land might have been made, if the disability created by the act of parliament “ did not stand in the way.” The question as to the character of the devise is to be first con *148 sidered; in exclusion of that arising from the disability in question ; and, when it is established to he land, considered in that relation, the disability then attaches, and vests the property in the Commonwealth in the case before us. No confusion can arise in this respect, but by blending two questions, which ougbtto be considered separately, and in succession. As to the necessity of making an actual election in order to vest the property as land, the foregoing cases clearly shew that land has, under the circumstances before us, been recovered as land, which has not only not been elected to be claimed as land, but, on the contrary, has been claimed as money. The better principle seems to be that, which is distinctly stated in the modern case of Hart v. Knot, before mentioned, that the devise to the residuary legatee is a devise of land, subject, however, to a charge in favour of creditors and specific legatees to the amount of their respective claims; and it is farther seen that if this charge does not. exist, (as in the case before us,) and so proportioaably where it exists only in part, it will retain its original character of land.
I have said that no election of. the devised subject as land is necessary to be made, and that, on the contrary, it is held to be land, although the party may have elected to claim it an money. In the two cases of Roper v. Radcliffe, and Attorney General v. Lord Weymouth, the interests were esteemed by (ho plaintiffs as money, and not as lands; and yet it was adjudged that they enured to them as lands: the plaintiffs in those cases surely would not have claimed them as lands, as they were severally disabled to take lands. So, in the case of Hart v. Knot, the residuary legatee elected to claim nothing: she was defendant in ejectment, and had done nothing; and yet the interest was adjudged to vest in her as land.
It follows as a necessary corollary from this principle, that it is of no importance, that the devisee is incapable of electing land, as being disabled to hold it. The objection equally lay in the papist and mortmain cases before mentioned, and yet was disregarded. It is certainly of no account, if the character of the devise does not depend upon an actual election, and Is not varied where no election of any thing is made, or where the election made is of money. The true principle is that, before mentioned; that it is a devise of the land, subject to the *149 charge, and where the charge does not in fact exist, or as far as it does not exist, the subject remains what, it was before; that is to say, land. That character arises from “ the option” to take it as land, which option may also he carried into effect by merely remaining neuter, as in the case of Hart v. Knot. That case is analogous to the case of Shermer v. Shermer’s exeeuiors, in this court.(a) In that case, the estate bring devised, after a life estate in the testator’s wife, to “ whoever she should “ think proper to make her heir or heirs,” it was held that she took a fee, from “ the power to name the person or persons she “ might choose to succeed to her partand it was farther held that, on her failure to make a specific nomination of any person, “ by suffering her.legal representatives to succeed her, “ she actually made them her heir or heirs, as much as she “ would have done by pointing them out by an express de- “ vise.” The principle of this decision, in both aspects, applies entirely to the present case-
These principles and authorities are decisive of the case before us. The character of the interest is first to be settled, before the question of alienage arises; and, in principle, there is no difference between this case and those of papist and mortmain devisees before mentioned, in which the disability to elect and hold land was not made, or, if made, was overruled.
On these grounds, without stopping to inquire into the character of the estate from the circumstance of its being a devise of the rents and profits, I am of opinion that the devisees took the inheritance of the land itself by the devise before us; and, it being agreed that they are aliens, that the same enured to the Commonwealth on the ground of forfeiture by an alieuation to aliens.
1 am also of opinion that the cases cited clearly prove that a Bill in Equity is the proper proceeding to enforce the trust in the case before us. As to what is said of its being rigorous, and contrary to the principles of a Court of Equity, to sustain the bill in the present case, I will remark that it has been holden by the House of Lords, (b) that the disability of an aliento purchase lands was not a penalty or forfeiture, but arose from the policy of the law; and that, on this ground, a *150 demurrer to a bill praying a discovery in this particular was overruled.
On all these grounds, I am of opinion that the decree of the Chancellor is erroneous; and that the demurrer should have been overruled, and the Bill sustained.
Thus considering the law of this case, I regret to learn that the decree of the Chancellor is to be affirmed by the equal suffrages of the judges of this Court: and this the rather, because I am authorized by judge Brooke(1) to say, that his present impression would incline him to say that that decree ought to be reversed.
Judge Fleming. In ordinary cases, where judgments or decrees are affirmed by the unanimous opinion of the court, it is seldom necessary to assign reasons for such affirmances; but, in cases of magnitude, especially where there is a division in the court, the reasoning of the judges, respectively, will probably be expected: and I deeply regret that, on this occasion, one of our enlightened brethren thought he had reason to withdraw himself from the cause; and the circumstance is the more to be lamented, as the other members of the Court are equally divided in opinion.
Although eminent talents and great ingenuity were displayed on both sides, in the several elaborate arguments of this important cause, its merits seem comprised within a narrow compass ; the principal question being whether a citizen of the Commonwealth may legally devise his lands, lying within the same, to his executors in trust, to be by them sold to citizens of the Commonwealth, and the money arising from the sales remitted to his alien relations in a foreign country 1 The Commonwealth denies the right of the testator to make such devise; claims the lands by way of escheat; or rather, the money for which they have been, or may be sold; and comes into a court of equity to assert its right, exhibiting a bill therein, complaining, among other things, “ that Thomas Bryan Martin, “being seized and possessed of a considerable estate, both real “ and personal, and well knowing that his relations, as British subjects, could not inherit his real estate in Virginia,- in the *151 5t event of his dying intestate, advised, and took counsel, to disic cover in what manner ho might most effectually secure his “ estate, after his decease, or the greater part, thereof, to his “ sisters, who were, and still remain, British subjects, and aliens “ to the Commonwealth.” The bill further charges, “ that Robert Mackey and John S. Woodcock, executors and trustees under the will of the said Thomas Bryan Martin, although the escheator of the Commonwealth, immediately after they assumed upon themselves their said character, notified to them the claim of the said Commonwealth, and did actually hold an inquest of esdluat, they, the said executors and trustees, contending that the lands devised by the said Martin, as aforesaid,were devised to them in fee simple, have since sold (he greater part, if not the whole, of the said lands.” The bill proceeds further to charge, “ that, from the whole structure of the said will, a trust Is in law and equity, created thereby, the execution of which may be demanded in favour, and for the use and benefit, of the said Commonwealth, and the prayer of the bill is, “ that the said Mackey and Woodcock may be decreed to perform the said trust, contained in the said will, in favour of the Commonwealth, safaras the said Commonwealth may be entitled to demand the same” A very just reservation, and qualification of the prayer, indeed.
Although the cause was instituted in a Court of Equity, it was argued altogether on legal principles; and I have considered it, first, as a question of law; and then, briefly, as a case in equity.
As an officer of the public, I have ever been attentive to, and careful to preserve, the rights, and just interests, of the commonwealth; but I cannot render unto Casar things that, in my conception, are not Cwsar’s.
Neither the draftsman of the bill, nor I1Í3 coadjutors in the arguments, have convinced me that the testator had not a right, both in law and equity, (and more especially in the latter) to dispose of his estate in the manner prescribed by bis will: but, had he died intestate, his lands would not have es-cheated; for, ¡hough his sisters in England, being aliens, eouM not have inherited his lands in Virginia ; yet, he had relations who were, and still are, citizens of the Commonwealth, and capable of Inheriting his lands within the same, That civcv'v *152 stance, however, not being stated in the record, I have coa» sidered the case, as it was argued, on a supposition that he had no relation capable of such inheritance. It is not contended but that the testator, at the time of making his will, was a citizen of the Commonwealth; and that he remained so to the day of his death: he had capacity then to dispose of his estate, by mill, to whomsoever he pleased, and in any manner he thought proper, not prohibited by the law of the land : though one of the counsel said, “ he intended to play a trick on the Commonwealth.” And another of them, in plainer language said, “ be intended to defraud the Commonwealth of its right of escheat but, from what source that right is derived, I must confess, f have yet to learn. To me it seems a novel doctrine that it is fraudulent for a man to devise his justly acquired estate to citizens in trust, for the benevolent, and meritorious purposes, the use and benefit of his nearest, and dearest relations, who might probably be in great need of his bounty. But let us inquire by what law he was prohibited or restrained from making such devise ? By the English laws, founded on policy, say the council for the Commonwealth. It is admitted that we borrow many of our laws, especially some of those applicable to the subject before us, from the laws of England ; by which alone the claim, of the Commonwealth was advocated in the arguments of this cause.
It was justly remarked by that great oracle of the law (Lord Coke,) “ that it was not sufficient simply to know the “ law, but it was also necessary to understand the reason “thereof; as a guide to just and rational decisions:” — and much having been said on this occasion respecting its reason and policy, I proceed, first to .consider the reason and policy of the English laws respecting aliens holding lands and personal-estate within the kingdom ; and then, briefly, consider the pc licy and spirit of our own laws on the subject.
With respect to lands, it took its rise, in England, unde-" the feudal system, when every holder of land owed allegiance to the Crown, and was bound, in consideration of protection, to assist in defending the realm; which might be inconsistent with the allegiance which an alien owes to his own natural Liege Lord: — besides that thereby they might be, in time, subject to foreign influence, and feel other inconveniences.
*153 Yet, notwithstanding the sound policy of this law, so strictly adhered to and enforced in England, aliens may there rent bouses, on long leases, for the convenience of trade, which they may, and do, exercise freely, and thereby acquire property, to the amount of millions in goods, money, and other personal estate : — also, an alien may there bring and maintain an action, concerning personal property, and muy make a will and thereby dispose of his personal estate, (a).
The testator, in the case before us then, by devising his lands to citizens to be sold to citizens, and directing the purchase money to be remitted to his alien sisters abroadj committed no breach of the letter, spirit or policy of the English iaws ; and consequently none of our’s either.
Thomas Brym Martin might undoubtedly, by deed, have conveyed his lands in trust, with power to the trustees, at their discretion, to sell the same to citisens, in Ms , own life time ; and to remit the product of the sales to his alien sisters in England ; and 1 wish to be informed what is the difference, or injury to the Commonwealth, in his having done so, by his last will and testament, and the trust to be executed after his decease ?
The ojily rational ground for prohibitory laws, in any country, restraining the free exercise of a citizen’s discretion in. disposing of his estate, either by deed or by will, (that great spur to industry, and one of the dearest privileges known in civil society,) must be the safety of the state. And, surely, that can be no more endangered by the purchasers of the lands under the will of Thomas Bryan Martin (being citisens) holding the same, than if the testator was still living, and holding them in his own right. (1)
Thus much for the reason and policy of the English laws. But Mr. Wirt urged,with vehemence, “ that the strong ground of policy applies as well to money as to lands for, says he, “ an alien, holding money, may throw it into the hands of enemies, *154 and thereby endanger the public safety.” But the laws oí England, their commentators and judges, all clearly distinguish between them ; — or why do they to this day permit and even encourage, aliens to acquire and hold, to their own use and benefit, personal property to any amount and to maintain actions, for the recovery of it, from British subjects ?
In a modern case, in the Court of King’s Bench, whilst Lord Mansfield presided there, the whole Court were of opinion that an action was maintainable on a ransom bill, although the plaintiff was an alien enemy at the time of the contract, and the defendant a British subject; and gave judgment accordingly. See Ricord v. Bettenham, 3 Burrow, 1734.
It is said, however, that that case has been overruled in the Exchequer Chamber. Be it so ; — the circumstance does not affect the present question; and the case was mentioned merely to shew the great liberality and justice of the Court of King’s Bench, in deciding on contracts made between British subjects and their alien enemies.
Had Thomas Bryan Martin’s estate consisted wholly of personal property, can the counsel for the Commonwealth, or the most sceptical casuist, deny that he might well have bequeathed the same to his alien sisters abroad ? why not then sell his lands to citizens of the Commonwealth, and remit their product in money, to those alien sisters ? — The proprietors, purchasers of those lands, still owe allegiance to the Commonwealth, and are equally bound with other citizens to aid in its defence. But, says Mr. Attorney General, “ a devise of the rents and profits of the land was a devise of the land itself.” That, as a general position, seems an argument of force, and is supported by some authorities ; — and if, in the case before us, the devise of the rents and profits had been absolute, without a qualification, the argument would have weight; but it is only a partial devise of the rents and profits, limited and controlled by the will; and the intention and particular direction of the testator must govern throughout; not being, in my apprehension, prohibited or restrained by law.
But it was further contended, that by the devise of the rents and profits, even for a short, limited time, “ the lands passed to the devisees.” — That doctrine is clearly refuted by *155 the case of Doughty v. Bull, 2 Peere Wms. 320, where the Master of the Rolls decreed that lands devised to be sold when the trustees should think fit, the rents and profits going to certain devisees for a time, at the discretion of the trustees, must at length he sold under the devise : which decree was affirmed by the Lord Chancellor King, and has never been overruled, so far as 1 can learn. It is a strong case, precisely in point, and forcibly applies to the one before the Court; — upon these plain and well-settled principles, that the manifest intention and direction of the testator, not prohibited by law, must prevail; and that lands devised to be sold are thereby made personal estate. 2 P. Wms. 323. But the case of Roper v. Radcliffe was cited and much relied on by the counsel for the Commonwealth, which applies not to the case before the Court, as not being the case of an alien but of a papist ; and predicated on the statute of the 11th and 12th of William the third; — a political act of parliament, the object of which was the better to secure the protestant succession to the crown of Great-Britain, at that time thought to be in danger, from the adherents to the house of Stuart, who were chiefly Roman Catholics. And the decision was on an appeal to a House of Lords extremely jealous of the influence of popery, and strongly devoted to the then reigning monarch; — it was also against the general opinion, and reasoning of the judges, and gentlemen of the bar in Westminster Hall. And, to this day, the judges in England pay respect to the decision, not on account of its justice, but, because the statute of William against popery, on which it was founded, remains unrepealed, and a protestant monarch, of the same dynasty, is still on the throne. That act of parliament was never in force here; but its principios are condemned, reprobated, and held in abhorrence, by our bill of rights, constitution and subsequent acts of assembly, as unjust and incompatible with the genius of a free government; and therefore, I consider myself not bound by that case, nor will I pay respect to it.
Although the* fountain of justice is, perhaps, as pure in England, as in any part of the universe, yet we all know that the stream even there, has been sometimes polluted by the undue influence of the crown. But, admitting, for a moment, the case of Roper v. Radcliffe to be authority in this Court, it could *156 have no effect on the decision of this cause; for the disabilities of aliens and papists even in England are various and materially different. (1)
But these were other cases cited to shew, that, where lands are devised to be sold, and the purchase money appropriated to particular purposes, the heir has an election to pay the money and take the land. But, in the case before us, the legatees could have no such election ; because, being aliens, they could neither take the lands by descent, nor hold them by purchase.
Lord Mansfield, in giving his opinion in the case of Foone v. Blount, in Cowper 464, where the case of Roper v. Radcliffe was cited, observed, “ that a Roman Catholic, being disabled by statute from taking and holding lands, shall not “ make his election, because there is a law which says, that, “ being a papist, he shall not take the land; and therefore a « Court of Equity would decree that he should take it iu mo- » ney.” — So, in the case before us, the devisees of Martin being aliens, incapable of taking lands by descent, or holding them by purchase, are disabled from making an election; and therefore must take the money bequeathed to them, arising out of the sales of the lands, made to citizens of the Commonwealth, or of the United States.
As to escheats, there were two kinds known to the ancient English laws, the one regal, and the other feudal s the former were forfeitures which belonged to the king by ancient right •and prerogative of the crown, as where a person commits treason, his estate shall escheat, and be forfeited to the king s the other which accrued to every Lord of the fee, as well as to the king, by reason of his seignory; as by the death of his tenant, intestate, leaving no heir 5 and such would have been the case before us, according to precedents, had Thomas,Bryan Martin died intestate in the life time of the late Lord Fair-fax, to whom the lands, being within his proprietory, would have escheated in default of an heir of the intestate, capable of inheriting. And admitting that the same right of escheat, possessed by Lord Fairfax, since his demise became vested in the Commonwealth, (of which some have doubts,) yet the right *157 of escheat is purely of a legal nature, where equity cannot, or should not, interfere, in aid of the right, so claimed by the «Commonwealth.
Besides, had Thomas Bryan Martin died intestate, leaving bo heir capable of inheriting his lands ití Virginia, before the Commonwealth could have been entitled by escheat, there must have been an inquest, and office found, to establish those facts, and, by way of instruction, minutely describing the lands charged to be so escheatable.
It is true, that the bill states, “ that the escheator of the 88 Commonwealth, immediatelyafterthe said Mackey and Wood-88 cock assumed upon themselves the said character of cxe88 cuiors and trustees, notified to them the claim of the Com-88 monwealth, and did actually hold an inquest of escheat /’ but what proceedings were had on the said inquest, or what was the result thereof, is not stated in the bill, nor does it appear in any part of the record: — and, if we may be allowed to presume any thing on the subject, the presumption is that the result was adverse to the claim of the Commonwealth, or it would undoubtedly have been set forth in the bill.
Having hitherto considered this case, (as it was argued,) under a view, and operation, of the laws of England, let us now advert a little to the spirit, policy, and progressive lenity and liberality of our own laws on the subject; which, in my conception, reflect great honour on our infant and beloved country ; — and present an aspect of the cause widely different from that already noticed: — and are still more decisive.
By a clause in an act of assembly, passed in the year 1779, when vve had just passed the Rubicon, and were at war with one of the most powerful nations on earth, and struggling 88 for 88 liberty and independence” with halters about our necks, (some of our best citizens being proscribed as rebels by the British government,) and every man's patriotism put to the test, if was enacted, “ that ail persons, as well foreigners as others, 88 shall have right to assign or transfer warrants or certificates 88 of survey for lands, and any foreigner purchasing warrants “ for lands may locate and have the same surveyed, and, after 88 returning a certificate of survey to the land office, sha!! be 88 allowed the term of two years, either to become a ciiizen, or 88 to transfer his right in such certificate of survey to some ci88 tizen of this, or any other of the United States of America ?
*158 That law is still in force, having been re-enacted in the year 1792. See Rev. Code, 1st vol. ch. 86. sect. 40. p. 147.
By an act directing the course of descents, passed in the year 1785, also now in force, it is provided, “ that, in making “ title by descent, it shall be no bar to a party that any ances- “ tor, through whom he derives his descent, is, or hath been, “ an alien.”
By an act passed in December 1785, intitled an act con-corning aliens, it is enacted, “ that in case that war arise be- “ tween the United States of America and any foreign state, “ the merchants, and people of such state, their families, “ agents and servants, found in this Commonwealth at the be- “ ginning of the war, shall not be attached, either, in their “ body or goods because of such war ; but shall be warned by “ proclamation from the governor, (talcing thereon the advice “ of the council of state,) that they shall depart the Common- “ wealth with their families, agents and servants, afovesaid, “ and their goods, freely, within forty days after the proclama- “ tion made and published. In the mean time they shall not “ be impeached, nor let of their passage, or of making their “ profit of their merchandizes, if they will sell them.”
“ And in case that, for defáult of wind, or of ship, or for “ sickness, or for other evident cause, they cannot depart the el Commonwealth within so short a time, they shall have other “ forty days, or so much more as the necessity of their affairs “ may require, and the governor and council may think safe !! to allow; and, in the mean time, may sell their merchandise “ as before is said.”
Those aliens then, even in time of war, might legally depart unmolested with the money arising from the sales of their merchandise and other treasure, and throw it immediately into the hands of our enemies at their pleasure ; — Mr. Wirfs ei strong ground of policy” to the contrary notwithstanding.
The justice and liberality of those acts of our legislature, in the gloomy and trying times when they vyere enacted, speak for themselves, are highly praise-worthy, and need no further comments of mine.
It was argued, however, in this case, by Mr. Attorney General, that “ the appellees, by their demurrer, confessed the *159 si contents of the bill to be true.” — By the demurrer they confessed the facts charged in the bill, but by no means the in-' ferences, drawn by the counsel, from those facts : for instance, they confess, “ that their testator advised and took counsel to “ discover in what manner he might most effectually secure his “ estate after his decease, to his sisters, who were, and still remain, British subjects, and aliens to the Commonwealth, “ and that he made his will accordingly, of which he appoint- “ ed them executors: — that they were notified by the escheat-- “ or the claim of the Commonwealth; — that he held an inquest “ of escheat, and that they sold part of the land, &c.” But they deny that “ from the whole structure of the will, a trust “ is, inlaw and equity, created thereby, the execution of which “ is in favour and for the use and benefit of the Common- “ wealth.” — And such their denial is, in substance, stated and complained of in the bill.
The object of the testator was, I conceive, not to play a trick on the Commonwealth, and defraud it of its right of es-cheat, (which right, in my apprehension, never existed, even in idea, ’till the claim was brought forward to public view by the avarice of an cscheator, and advocated by counsel learned in the law, and well versed in the chicanery and subtilties of the profession, hut it was to exclude his distant collateral relations here from inheriting his lands in Virginia, to the prejudice of his nearer and dearer relations in England, who, being aliens, had not capacity to inherit his lands, but might well take, to their own use and benefit, the product of them, when sold to citizens of this, or any of the United States of America. And will this government, whose citizens proudly boast of its justice and magnanimity, meanly stoop to extort from female indigence the pittance of a dying brother’s bounty, and place the paltry amount in its coffers, under the specious pretext of guarding the public safety? — I shudder at the degrading idea, and confidently trust that such unworthy conduct will never be realized by our government.
As the case appears before the Court, if the Commonwealth has any right, (though I am clearly of opinion it has none,) it must be at taw, for equity seems most decidedly in favour of the appellees ; I am therefore of opinion that the decree sustain *160 ing the demurrer, and dismissing the bill, is correct, an¿ ought to be affirmed.
There being an equal division of the court, it follows, according to rule, that the decree is affirmed.

 1 Bro. Ch. cases, 449.

 See Trelarancy v. Booth, 3 Atk. 307.

 Fonbl. book I, ch. 6, sect. 9 notes (t) and (v); Walker v Denne, 2 Ves. jr 176; and Doughty v. Bull, 2. P. Wms. 320.

 1 Fonbl. 422; 2 Ves. jr 170.

 1 Fonbl.419. note (s).

 1 Wm. Bl. Rep. 129.

 Bradish v. Gee, Ambl. 229; Earlom v. Saunders, ibid. 242.

 Walker v. Denne 2 Ves.jr. 176.

 Ackroyd v. Smithson, 1 Bro. Ch. Rep. 500.

 Short v. 1 P. Wms. 470; Yates v. Compton, ibid. 310; Doughty v. Bull, ibid. 320; Trelawney v. Booth, 2 Atk. 307.

 s Bac. m (Urn's, edition.

 5 Bro. Parl. cases 269.

 1 Fonbl. 422 note (v).

 Ambl. 11.

2 Bl. Com. 273.

 1 Wash. 56, Shelton’s executors v. Shelton.

 Trafford v. Ashton, 1 P. Wms. 418.

 Ambl. 20.

 Doug. 770.

 Comp. 464,

 2 P. Wms. 320.

 1 Roll, 194; Hardr 495; Danvers. 321—2; 3 Ch. Rep. 20; and 1 Wm. Bl. Rep. 169.

 2 Bl. Com. 337; 7 Bac.Abr. 135.

 7 Bac, Abr. 134.

 9 Mod. 167,

 10 Mod. 242.

 a Bro. Parl. cases, 360.

 2 P. Wms, 382.

 2 Bro. Parl. cases, 412.

 Comp. 467, (Anno. 1776.)

 1 Wash, 286.

 4 Bro. Parl. cases, and Parker’s Reports, p. 163.

 Note. Judge Brooke was present in court at this time.

3 (a) Lutw: 34,-1 Black, Com. 372.

 Note. In the decline of the Roman Empire, one of the greatest grierances complained of by the people, in some of the distant provinces, was the tyranny of their governors, in denying them the privilege of alienating their property. The tyranny, indeed, began in the city of Rome in the time of Augustus, before he became emperor, when the citizens were allowed to dispose of only three fourths of their property by will.

 Note. See Statutes 3 Car. 1; 2 Car. 2; 1 Wm. and Mary; 11 and 12 Wm. 3; 13 Ann; 1 Geo. 1.; 3 Geo. 1.; 11 Geo. 2.; 33 Geo. 2.; and others.