## Case No. 11,926.

### ROBERTSON v. MILLER et al.

[1 Brock. 466.] [1]

Circuit Court, D. Virginia. Nov. 27, 1820.

PARTNERSHIP—REAL ESTATE—SURVIVING PARTNER —ARTICLES OF PARTNERSHIP—ALIENS—ESCHEAT.

1. B. M., W. B., and I. M., entered into articles of copartnery in 1803, to continue in force for four years, which might be renewed by the joint consent of the whole, given in writing, one year before the expiration of the term. By one of the articles, it was stipulated, "that in case of the death, or bankruptcy of any of the said parties, in order to prevent any altercation with the heirs, executors, administrators, or assigns of the deceased, or bankrupt, the shares of the profits, as well as capital of the deceased, or bankrupt, shall be paid by the survivors, or solvents. agreeably to the yearly statements of company's affairs, prior to his death, or bankruptcy." The first named partner, was an alien. and W. B. was a citizen; I. M., the third partner. also a citizen, died in 1807, and the surviving partners settled with his representatives, and conducted the business, without any new articles between themselves. but without any other change in the circumstances, or in the expression of the terms of the original articles. until December, 1811. when W. B.. the second named partner. also died. During the partnership, the said W. B. had purchased a house and lot in Lynchburg. with the funds and for the benefit of the company, but took the conveyance to himself. By his will, the said W. B.. devised his estate to his relations in Scotland, who are British subjects. By an act of the legislature of Virginia. passed in February. 1813. it was enacted. that if an alien, residing within the United States, and holding lands here. shall sell the same to a citizen, before any proceedings instituted by the escheator to escheat them, the purchaser shall hold and enjoy the same, saving the rights of other persons. In November, 1815, B. M.. the surviving partner, being an alien, but a resident here. sold the house and lot to R.. a citizen. who paid the greater part of the money. but becoming apprehensive that the property was escheatable, filed his bill, praying, that. if his title was good. the escheator might be enjoined from proceeding. or if not, that B. M. might refund the purchase-money. Held that, if there had been nothing peculiar in the articles of copartnery, the said house and lot would have passed

in moieties to the devisees of W. B., the deceased partner, and to the surviving partner, subject to the title of the commonwealth, but chargeable with the debts of the firm. in the event of the personal fund being insufficient.

2. But these articles substitute a new rule for that which the law would have made, if the parties had been silent, and, according to the true import of those articles (alienage apart), the whole subject, real, as well as personal. passed to B. M., the surviving partner, he being. however. bound to render to the representatives of W. B., the deceased partner, his share of the capital and profits, according to the last yearly statement on the books of the firm; and, on such shares being accounted for, a court of equity would. if necessary, decree a conveyance of the house and lot to the said surviving partner.

3. Although the time for which the articles of copartnery were formed had expired, yet as the business was still carried on. without any change in the circumstances, or in the expressions of the articles, it was still conducted on its original principles, and was a continuing partnership.

4. As the partner who purchased the lot. and the partner who sold it, were aliens, it was escheatable; but as there were no proceedings instituted to escheat it, and it was sold to a citizen, the right of the commonwealth was released by the act, although the estate of the surviving partner was only an equitable one.

In equity.

MARSHALL, Circuit Justice. William Brown, a citizen of Virginia, and Boyd Miller, a British subject, entered into partnership, and carried on trade and commerce, by the name of "William Brown & Co." During the partnership, William Brown purchased a house and lot in Lynchburg, with the funds and for the benefit of the company, but took the conveyance to himself. Some time in the year 1811, William Brown departed this life, having first made his last will in writing, which was properly recorded in February, 1812; by which, after certain legacies, his estate was devised to his relations in Scotland, who are British subjects. By this devise, the interest of William Brown, in the house and lot in Lynchburg, passes to the devisees, subject to any claim Boyd Miller may have upon it, as surviving partner. Boyd Miller became a resident of Virginia. and in November, 1815. while a resident, sold the house and lot in Lynchburg, to Archibald Robertson, the complainant. for $8,000. A suit was, at that time, depending in this court, brought by the executors of William Brown, against Boyd Miller and others, to which the devisees and legatees of William Brown were afterwards made parties, for a settlement of partnership transactions, and a distribution of the partnership fund. In this suit, it is understood, that the sum for which the house and lot in Lynchburg sold, was considered as one item in the total amount of the fund. Boyd Miller was decreed, as surviving partner, to pay to the representatives of William Brown. the sum of $225,204.04, with interest, and, of course. became entitled to the partnership effects. Archibald Robertson, the purchaser of

---

[1] [Reported by John W. Brockenbrough, Esq.]

the house and lot in Lynchburg, after paying the whole purchase-money, except $1,717.78, became apprehensive, that the property had become escheatable to the commonwealth, and that the title conveyed to him, by Boyd Miller, was not a good one. Under this apprehension, he has filed his bill, praying that the title may be considered; that if it is a good one, the escheator may be enjoined from instituting proceedings of escheat: and that. if it is not a good one, Boyd Miller may be decreed to refund the purchase-money, and may be enjoined from all proceedings to collect the residue. The answer of Boyd Miller admits the several allegations of the bill, and contends, that the proceeds of the said house and lot have been rightly applied, under orders of this court, to the payment of partnership debts. There has been no explicit direction of the court on this subject, nor has any question on it ever before been made. The only points decided by the court are, that the debts of the company should be paid, and that the residue of its property should be divided according to the articles of copartnery, which had expired, but under which the parties had continued to act. This question, therefore, is still open, and ought to be determined on the principles which would have applied to it, had it been made in November, 1815. William Brown, having held the legal title to the property in question, in trust for the firm, it will be considered, in a court of equity, as if the conveyance had been made to the firm; and the inquiry will be, what is the operation of the law of escheat, upon such property, where one of the partners is an alien?

If an alien merchant, who is alone, purchases a house and lot for the purposes of trade, either in fee, or for life, that house and lot are escheatable; and I can see no reason, if he be a member of a firm, why his interest should not be escheatable. The commercial law does not extend its protection to real estate acquired by alien merchants. The debts of the firm may attach on his interest, as his own private debts would attach on his own private estate, but no farther; that is, I presume, that what remained after exhausting his personal, might charge his real estate. This would, I presume, be the rule, in the case of an estate at law; and a court of equity, in the absence of peculiar circumstances, would follow the rule of law. In the lifetime of William Brown, a court of equity would have subjected the interest of Boyd Miller to the claim of the commonwealth, chargeable, only, with such debts as the personal fund of the company was insufficient to pay. On the death of William Brown, the whole legal estate passed to aliens, and became escheatable. Would the property, if then escheated, have been chargeable with the debts of the company? However this may be had there been no other effects for the payment of debts, I know of no law or principle which would subject this real property

to the payment of debts, in exoneration of the personal fund. In this view of the subject, the fact that the escheat has not taken place, can make no difference. If a court of equity would not interfere, to subject the proceeds of escheated land to the payment of debts in exoneration of the personal fund, neither, I presume, would it interfere to order the sale of escheatable land, and the application of the proceeds to the discharge of that fund.[2] If, then, there was nothing peculiar in the articles of copartnership, the real estate, composing a part of the capital stock of the firm, would, on the death of some of the partners, pass by the will of the decedents, or go in moieties to the two partners, subject to the title of the commonwealth, which, charged with the payment of debts, would act on each moiety, according to the law, as applicable to that party. Both being aliens, both moieties would be escheatable.[3]

But it is contended by the defendants, that the articles of copartnery, in this case, transfer the whole property to the survivor. The articles of copartnery were entered into on the 14th day of April, 1803, between Boyd Miller, William Brown, and John M'Credie, and were to continue in force for four years from the 1st day of September, 1803, and might "be renewed by the joint consent of the whole, in writing, given one year before the expiration." The books were to be balanced in the month of September, in each year, and an inventory of all their effects, with a true state of all their affairs, was then to be made out. In the fourth article, it is agreed, that "in case of the death or bankruptcy of any of the said parties, in order to prevent any altercation with the heirs, executors, administrators, or assignees of the deceased, or bankrupt, it is agreed, that the shares of the profits, as well as capital of the deceased or bankrupt, shall be paid by the survivors or solvents, agreeable to the yearly statement of the company's affairs, prior to

---

[2] The act of assembly of Virginia, "concerning escheators" (1 Rev. Code 1819, § 14, p. 297), provides, that where any person shall die indebted, seized of lands which shall become escheated to the commonwealth, not having personal property sufficient to pay such debts, the creditor may exhibit his petition, before the court of the county or corporation in which the escheat takes place, or in the superior court of law for such county, making the escheator a party defendant; and the court shall proceed to judgment according to the right of the case, and render the same for such sum as shall appear to be due to the petitioner.

[3] The form of expression here used, is somewhat ambiguous. The chief justice clearly does not mean to say that both of the partners referred to were aliens, for he had already stated that Brown was a citizen. The meaning of this paragraph seems to be, either, that both moieties would be escheatable if both partners were aliens; or, that Miller being an alien, and the moiety of Brown (himself a citizen) having passed by his will to aliens, both moieties were in fact escheatable, under the laws of Virginia, after the death of Brown.

his death or bankruptcy," &c. It is very material to settle the extent of this article. If it be an agreement, to transfer the real and personal estate of the company, to the surviving, or solvent partner or partners, entitling the representatives of the deceased, or the insolvent to "his share of the profits, as well as capital," "agreeable to the yearly statement of the company's affairs, prior to the death or bankruptcy," then it is equivalent to an agreement, that the right of survivorship shall take place between the parties, as to the subject itself, giving the assignees of the bankrupt, or the representatives of the deceased partner, his share of the capital, and profits according to the last yearly statement, instead of that interest to which, independent of special compact, he would be entitled by law. It is the substitution of a rule, by the act of the parties, for that rule which the law makes, where the parties are silent.

After the best consideration I can give the subject, I am in favour of this construction for several reasons. The article is professedly entered into, in order to prevent any altercation with the heirs, executors, administrators, or assignees of the deceased or bankrupt. This object cannot be effected, unless the property be transferred to the survivors or solvent partners, on the terms specified. The rule for ascertaining annually the rights of the parties, would be useless, if the application of that rule were to be defeated. The article contains, also, other provisions, which demonstrate, I think, the intent with which it was made, and show a determination to leave nothing for discussion in the event provided for. Five per centum is, in this annual statement, to be deducted from the cost, and charges of the goods on hand; and no allowance is to be made for bad or doubtful debts. These goods, then, and these debts, become the property of the surviving or solvent partner, and the representatives of the deceased, or assignees of the bankrupt, are entitled, in lieu of all claims on the subject, to the share allowed in the annual statement. Is there any reason for withdrawing real estate, considered by the company as a part of its stock in trade, from the operation of this article? I can perceive no reason for the exception. The parties certainly have not made it, and the court could not be justified in doing what they have not chosen to do. Their language shows an intent to comprehend lands. The word "heirs" could be of no other use. To introduce the exception, would defeat the object of the article. It would not only make the word "heirs" useless, but would reinstate those subjects of altercation, which the article intended to remove. The real property must be withdrawn from the fund, its value ascertained by some rule to be agreed on by the parties, or given by a court, and the residue be subjected to the rule stated in the article.

This construction is strengthened by the understanding of the parties, as illustrated by an event which has taken place. John M'Credie, one of the partners, departed this life in the year 1807, and his account was adjusted by the rule, which has been stated, without an idea on either side, that any other principle ought to prevail; and the court of chancery of the state has, I perceive by its decree directing a conveyance of the real estate standing in his name, given this construction to the article.

I think, then, had the event which has happened, taken place during the four years, for which the copartnership was originally prepared, it could not be doubted that the whole fund of the company, real and personal, would pass to the surviving partner; leaving the representatives of the deceased, entitled to their testator's share of the capital and profits of the company, according to the annual statement on the books. Putting alienage out of the question, I think it cannot be doubted that a court of equity would, in such a state of things, decree a conveyance to Boyd Miller, on his paying that share of capital and profits.

It remains to inquire whether the expiration of the time, for which the articles were formed, produces any alteration in the law of the case? I can perceive no reason for this opinion. Where two or more persons enter into a particular business for a stipulated time, under a special contract, and continue that business after the expiration of the time, without any change whatever, in the circumstances, or any expression of the terms, on which the business is conducted, the natural conclusion seems to be, that the business is still to be conducted on its original principles. The law, I think, would imply a contract, that it should be so conducted. Many examples might be adduced in illustration of this position. A tenant having a tenement for a year, at a stipulated rent, and holding over with the consent of the landlord, would be understood to hold under the original contract. If, for some years, he paid the same rent, and it was received by the landlord, the law would certainly raise a tacit agreement, binding on both parties, so long as the occupation of the land continued, without any dissent expressed by either party. So, with respect to the employment of an agent, or to an engagement of any other description. The testimony in the cause shows, that this general rule of reason is understood to apply to commercial companies. It also shows that the parties understood it, to be applicable to them. Their declarations were to this effect, and their clerk proves that the annual statement required by the articles, was regularly made, and that the business continued to be conducted in the same manner, and on the same principles, as before the expiration of the articles.

This court, in its decree in the original cause, without any reference to the question of escheat, considered the articles as regulating all the subsequent transactions of the parties, and directed the settlement to be

made in conformity with them. That opinion is still retained. Its application to the case before the court, will now be considered. The property in question, though conveyed to William Brown singly, having been purchased with the money, and held in trust for the company, must be considered in a court of equity, as if the trusts had been expressed, or as if the legal estate had in terms conformed to the trust. As the property was acquired under the articles of copartnership, the trust must accord with those articles. The title then is to be considered as if the deed had been made to the firm, and, if either of the partners should die, or become bankrupt during the continuance of the partnership, to the surviving partner, he paying to the representatives of the deceased, or the assignees of the bankrupt partner, his share of the capital and profits, including this property, as stated on the books at the last annual statement. Under such a limitation, it cannot be doubted, that the lot would pass to the surviving partner.

But the surviving partner is an alien, and this property was, therefore, while held by him, escheatable. Has the right of the commonwealth been released?

In 1813, the legislature passed an act, which was re-enacted in 1819, which contains the following clause. "And be it further enacted, that. where any alien, residing within the United States, holding, or claiming title to, any land, not heretofore escheated to the commonwealth by an office found, shall have bona fide sold, or demised the same, or shall have died testate, or intestate, seized, or possessed thereof, or claiming title thereto, and where any alien, residing within the United States, shall hereafter hold, or claim title to any such land, and, before any proceedings be instituted by the escheator, for the purpose of escheating the same to the commonwealth, shall bona fide, sell or demise the same, or die testate, or intestate, seized, or possessed thereof, or claiming title thereto; in every such case, the purchaser from such alien, or his lessee, heir, or devisee, being a citizen of the United States, shall hold and enjoy such land." [4] Boyd Miller, in 1815, when this property was sold to the plaintiff, was an alien, residing within this commonwealth, in possession of, and claiming title to the land in question, which had not then been escheated to the commonwealth, and the sale is admitted to be bona fide. The case is within the letter of the law, unless a distinction be taken between an equitable and a legal estate. I can perceive no ground for such a distinction. A court of equity will sustain the claim of the commonwealth, to an equitable estate, held by an alien. Why, then, should not the commonwealth release its right to an equitable, as well as to a

legal estate? And what good reason, founded in the principles of law, or of policy, can be assigned, for not releasing to a citizen, the right of forfeiture in lands, of which he holds the equitable title, the mere legal title being in a foreigner, under circumstances, in which that right would be released, had the legal title been conveyed? I am entirely satisfied, that the legislature intended to release the right of the commonwealth to all lands, held by an alien, whatever his title might be, in every case in which that alien. being a resident, sells to a citizen, before the right of the commonwealth has been asserted, and that the release is co-extensive with the title of the alien. I am, therefore, of opinion, that the commonwealth has released its title to the land, in the bill mentioned, and that the title is valid in equity. Although, upon a fair construction of the will of William Brown, I doubt, whether the legal estate would pass by it, to his devisees, and am satisfied, that he did not intend it should pass, it is proper, that they should release their right to the complainant, and I shall direct them to do so.

This court has been under the necessity of considering, incidentally, the title of the commonwealth, but cannot bind that title, since the commonwealth cannot be made a defendant, either by serving process on its escheator, or otherwise. Of that part of the case, the court has no jurisdiction, and, therefore, the bill, so far as it prays relief against the escheator, is dismissed, without prejudice. [5]

The following decree was entered: "This cause came on to be heard, on the bill (which is taken for confessed against the absent defendants, as to whom publication appears to have been made), on the answers of Boyd Miller, and of Samuel Garland, the escheator for the corporation of Lynchburg, on the facts agreed, and on the exhibits, and was argued by counsel: all which being considered, this court is of opinion, that on the true construction of the articles of copartnership, on which the business of William Brown & Co. was conducted, the whole equitable title to the house and lot, in the

---

[4] See 2 Rev. Code 1819. Append. 3, p. 505, c. 8, § 3; 1 Rev. Code, p. 354, c. 94, § 2.

[5] As to the rights of aliens. see Dawson's Lessee v. Godfrey, 4 Cranch [8 U. S.] 321; Hepburn v. Dunlap, 1 Wheat. [14 U. S.] 197; Fairfax's Devisees v. Hunter's Lessee, 7 Cranch [11 U. S.] 603; Chirac v. Chirac, 2 Wheat. [15 U. S.] 259; Jackson v. Clark, 3 Wheat. [16 U. S.] 1; Craig v. Leslie, Id. 563; Craig v. Radford, Id. 594; Orr v. Hodgson, 4 Wheat. [17 U. S.] 453; Blight's Lessee v. Rochester, 7 Wheat. [20 U. S.] 535; M'Creery's Lessee v. Somerville, 9 Wheat. [22 U. S.] 354; Hughes v. Edwards, Id. 48; Doe v. Robertson, 11 Wheat. [24 U. S.] 332; Carneal v. Banks, 10 Wheat. [23 U. S.] 181; Carver v. Astor, 4 Pet. [29 U. S.] 1; Shanks v. Dupont, 3 Pet. [28 U. S.] 242; Inglis v. Trustees of Sailor's Snug Harbour, Id. 99; Levy's Lessee v. M'Cartee, 6 Pet. [31 U. S.] 102; Breedlove v. Nicolet, Id. 413; Com. v. Martin's Ex'rs. 5 Munf. 117; Hubbard v. Goodwin, 3 Leigh, 492.

bill mentioned, vested, on the death of William Brown, in Boyd Miller, the surviving partner, and was conveyed by him, to the complainant, by the deed of the 11th of November, 1815. And this court is further of opinion, that Boyd Miller, being at the time, an alien, residing in Virginia, and Archibald Robertson, the purchaser of the said lot, being a citizen of the United States, and no proceedings of escheat having taken place at the time, the right of the commonwealth to the said property, is released by virtue of the act of assembly, in that case made and provided. But as this court has no jurisdiction, so far as the commonwealth is concerned, and though obliged to decide incidentally on its title, cannot bind it, the bill, as against Samuel Garland, the escheator, as well as against Boyd Miller, is dismissed, without prejudice. And this court doth further decree, that the absent defendants (the devisees, and legatees of William Brown, deceased) do release to the complainant, all their right in the house and lot, in the town of Lynchburg, conveyed to the complainant, by the deed of Boyd Miller aforesaid."