Cabb, «7.
The first question in this cause, and that on which every other question depends, is, Whether the disposition contained in Mrs. Alexander's will, of this land called Bunn's, is to be construed as a bequest of personalty to her daughter Frances, or as a devise of land ? Has the testatrix impressed on this land the character of money, or is it still land? In Fletcher v. Ashburner, 1 Bro. C. C. 497. the master of the rolls says, “ Nothing is better established than this principle, that money directed to be employed in the purchase of land, and land directed to be sold and turned into money, are to be considered as that species of property, into which they are to be converted ; and this in whatever manner the direction is given. The owner of the fund, or the contracting parties, may make land money, or money land. The cases establish this rule universally.” Seeing then, that the testatrix had the perfect power, we are to inquire what has she done ? She devises the land, to her executors, that they may sell and convey it, and her will is, that the produce of the sale he equally divided, between her daughter and grand daughter. Here is a complete sentence; a perfect disposition of the subject; the land devised to the executors to sell and convey, the proceeds bequeathed to the legatees: thus, clearly and defini *422 lively, impressing upon it the character of money. No body could have doubted this for a moment, if the will had stopped here. Is there any thing which changes this purpose so plainly declared ? any thing which, if the daughter Frances had died an infant, would have made this a devise of land? The testatrix proceeds: “but if my daughter Frances when married, or of age, should choose, she may take the land in fee, on paying half the value of it, to my grand daughter.” Here are three conditions precedent; three events which must happen before she can take the land: 1. she must come of age or marry: 2. she must, on either of these events, choose; she can’t do it before : 3. on paying half the value, after age or marriage, she may take the land. How can this bare power, thus clogged with three conditions precedent, operate to change the disposition so clearly and absolutely expressed in the sentence immediately preceding? In wills, the meaning of the testator, we are told, is the polar star. Can any body believe, that the testatrix here intended by the second sentence to change the nature and effect of the first? Such an interpretation, it seems to me, would violate common sense, as well as grammatical construction. Her settled intention, undoubtedly, was, that the land should be sold, and the money divided : but as her daughter would not need this money till she came of age or married, and as possibly she might .then prefer to take the land, and pay half the value, she gave her the power, by making this election and paying the money, to change her money legacy into land; but, surely, until this change happened, until these acts were done, it remained, to all intents and purposes, a money legacy. This was the character decisively impressed upon it; and in Ashby v. Palmer, 1 Meriv. 300. the judge tells us in so many words, that “ land once impressed with the character of money, must remain so impressed until some person elects to take it in its original character as land.” All would agree, I repeat, that this was a money legacy, if the power had not been superadded of taking the land; and *423 yet, vvliat is this, more than the law itself gives ? But ex-pressio corum qua: tacite insunt nihil operatur. Suppose land directed to be sold, and the money given to A. ho may elect to take the land, and no body can say him nay; but if he do not elect, it remains money; the character impressed upon it, is not affected hy the right oj election, unless that right be exercised. In our case, the testatrix gave the land' to her executors to sell, and the proceeds to the legatees. Suppose she had stopped here: both the legatees would have had the power to elect to take the land ; and if they had exercised it, the whole land, which was directed to bo sold, would have remained in specie; but it was not the less a money legacy. So here, the daughter, by electing to take the whole, and paying half the value, might have land instead of money; but until she performed these conditions precedent, it remained a money legacy.
Many cases were relied on in the argument, to shew, that the character of money was not definitively and imperatively impressed upon this property ; but, in my mind, they are clearly distinguishable. Thus, -where it was uncertain in what manner the owner intended the property to descend, or where a conversion was directed for a special purpose; or out and out, but the produce to be applied to a particular purpose; when the purpose fails, the intention fails, and equity regards the owner as not having directed a conversion. Thus, in the case of lands directed to be sold to pay the debts of the testator, if the debts are paid without a sale, it remains land; or if sold, as nothing but the payment of debts was intended, all beyond will remain real estate. All the cases cited may be referred to one or other of these principles; or else, to that doctrine of lord Roslyn, in Walker v. Denne, 2 Ves. jr. 170. 176. that the property shall be taken as it happened to be at the death of the party from whom the representative claims; a doctrine, which has been clearly overruled by many later cases; 1 refer among many others to Wheldale v. Partridge, 8 Ves. 235. Thornton v. Hawley, 10 Ves. 129. Biddulph v. Biddulph, 12 Ves. *424 161. Kirkman v. Miles, 13 Ves. 338. Ashby v. Palmer, 1 Meriv. 296. Craig v. Lesslie, 3 Wheat. 563. 583. In Ashby v. Palmer, the daughter, for whose benefit the land was devised to be sold, became a lunatic before she attained to full age, and continued so till her death many years after: no part of the real estates was sold under the trusts in the will: and the question was, whether the land was converted by the will into personal estate, or remained real ? The master of the rolls said, that “ when the daughter arrived at twenty one, the land being unsold, she might, if she had been competent, have elected to take it as land; or, if she had kept it unsold, being competent to elect, she might have been presumed to have so made her election; but here, she was manifestly incompetent to make any; and it is, as if she had died before the time arrived at which she could have elected.” Upon the most careful view I have been able to take of the subject, I am of opinion, that Mrs. Alexander’s will impressed upon the land in question, the character of money, which must remain until the daughter complied with the conditions on which alone she could take the land.
Has she ever done this ? She was married, we are told, before she attained to full age: could she after she was a feme covert make the election ? I doubt it, exceedingly.. If a simple act of election had been all that was necessary, perhaps equity, notwithstanding the husband’s marital rights, might have aided her. But here, she was not only to choose to take the land, but she could only take it on paying the value of the half of it. How was a married woman to do this ? She has no funds, no money; can she make the choice, and thereby not only prevent her share of the legacy from going to her husband as personalty, but also-saddle him with a large debt for land, the fee of which would go to her and her heirs ? Surely, no court of equity would aid her in such an enterprise. But if she could elect, she never did. It is said, her husband has elected for her, by taking the land at valuation, and paying the half value. *425 It is clear that he has taken the land, and paid for it; but by no means so clear, that he has done this for his wife. On the contrary, I think the whole res gestee shew, that he took, and held, and dealt with the land, as his own exclusive property. To be sure he calls it, in some recitals, the land he and his wife held under Mrs. Alexander’s will, and the land he got by his wife ; but these are loose expressions, and rather used to describe the manner in which he acquired the land, than the nature of the title by which it was held. But in all the essentials denoting property, he and those with whom he dealt, unquestionably, acted as if they considered him the fee simple owner. He conveyed it to Taliaferro in fee; and Taliaferro, intimately acquainted with the whole transaction, the acting executor of Mrs. Alexander’s will, the guardian of Lucy T. Hooe the co-legatee, the witness of the valuation and election, seemed perfectly content with Brooke’s conveyance. Indeed, we never hear a hint of any defect, till the original bill was filed in this cause. If Brooke had thought he was selling his wife’s land, why did he not take the conveyance of the lands he took in exchange for it, to her ? It was said, that under the will, unless the land was taken by the daughter, it was to be sold by the executors, and if taken by her, to be valued by two executors; and that Brooke’s having it so valued, shewed he meant to take for his wife. We are told, however, that the valuation was merely to ascertain, whether he should elect to take land at all; that is, that he might ascertain the money value of the subject. Now, if he could elect he must ex vi termini, have the power of deciding whether he would take the money or the land. Having this power, can we hesitate to conclude, that he would say, “ I prefer taking this as money, whereby I gain half the value to myself, jure mariti, to taking it as land, whereby I lose, not only the moiety I should have gained, but also the other moiety, which I shall have to pay, making a difference with me of the whole value ? If he concluded to take it as money, still the land being valued by the executors, and its price *426 settled, might he not very probably argue thus—“ I own half °f {h‘s price: I will pay the other half to Lucy T. Hooe, and take the whole land ?” If he had a right to choose to take money, no body could object to this but Miss Hooe, so far as it might affect her legacy; and we hear of no complaint from that quarter. True, this would not be following the will, and Brooke may not have gotten the legal title ; but it is clear to me, that it was never in his wife, nor in her heirs, nor could they ever get it. They could never have disturbed Taliaferro in his possession of Dunn’s, or justified the filing this bill.
My opinion on this part of the case, striking at the root of the plaintiff’s claim, renders it unnecessary to discuss at large the other points in the cause. The decree should be reversed, and the bill dismissed.
Cabell, J. concurred.
Tucker, P.
The question which lies at the foundation of this case, is, Whether Brooke had a good title to the tract of land called Dunn’s, sold by him to John Taliaferro the elder in 1789? a question, which depends upon the construction and effect of Mrs. Alexander’s will, and what has been done, and omitted to be done, under it. Brooke married Frances the daughter of the testatrix. There is no evidence of any election made by Mrs. Brooke herself, under the will of her mother, though it is contended, that her husband elected for her, to take the land, and pay the value of one half to her niece, and that she was thus invested with the fee simple estate, which he could not pass without her concurrence, by deed duly executed according to the ceremonies prescribed for conveyances of femes covert. It is also contended, that, even if his act or election could not bind her, or enure to her advantage, yet, if there was no election, the land continued to be real estate, and as such vested in her, and could not be conveyed by him to Taliaferro, without her deed executed with the solemnities of a *427 privy examination. On the other hand, it is said, that the r J character of personalty was imperatively fixed upon the property; that the transactions of Brooke detailed in the proceedings, were for his own benefit; and, as the right to the money vested in him as husband, he had a right to elect, and did elect, to take the estate to himself, which he after-wards conveyed to Taliaferro, as he had a right to do.
This view of the contest between the parties, presents, at once, the necessity of adverting to the doctrines of equity on the subject of the conversion of land into money, and money into land. The rule is, perhaps, as clearly stated by the master of the rolls in the case of Fletcher v. Ashburner, 1 Bro. C. C. 499. as in any other authority. He observed, “ that nothing was better established than this principle, that money directed to be employed in the purchase of land, and land directed to be sold and turned into money, are to be considered as that species of property, into which they are directed to be converted, and this in whatever manner the direction is given ; whether by will, by way of contract, marriage articles, settlement or otherwise, and whether the money is actually deposited or only covenanted to be paid, whether the land is actually conveyed or only agreed to be conveyed. The owner of the fund may make land money or money land. The cases establish this rule universally. If any difficulty has arisen in any case, it has been from special circumstances.”
It is indeed most true, that however well the rule is established, difficulties have arisen in many cases, and have much perplexed the judges. Of this a most conspicuous instance is afforded in the opinion of lord Eldon, in the case of Wheldale v. Partridge, 8 Ves. 233. These difficulties have arisen, sometimes, from failing to distinguish cases falling within the principles above mentioned, from cases where a sale of land has been directed, and some part of the disposition failing, a trust has resulted to the heir. But I think they have sprung mainly, from following too closely the phraseology of the judges in the different cases, instead of *428 bringing each case to the test of the principles out of which the rule has grown. These principles are,
l. That the owner of the fund may make land money or land; 1 Bro. C. C. 499. 1 Meriv. 300. Cvjus est dare, ejus est disponere. The will of a testator, if not in collision with the law of the land, is the law of his property. He has an absolute right to say what shall be done with it; and if he directs trustees to sell it and turn it into money, and pay it over to the legatee, that direction must be obeyed. If literally and strictly obeyed, the legatee can only receive personalty, and will not receive realty; and if he dies before the conversion, it will go to his personal representative as money, since he himself would have taken money; for,
2. Equity looks upon things which ought to have been done, as done; and if the trustee ought to have made the conversion, and has failed to do it, the property will pass to those who would have had the beneficial interest in it, had he pursued the directions of the trust.
3. The rule is, however, modified by this principle, that where money is directed to be turned into land, or-nice versa, the person entitled may elect in which way he will take, whether as money or land; and very slight evidence by acts done, will be sufficient. 5 Munf. 122. Amb. 229. 242. 2 Ves. jr. 176. 1 Bro. C. C. 500. But this right of election is of itself modified or subject to exceptions. For an infant cannot elect, 2 Bro. C. C. 56. though a court of equity may elect for him, 2 Rand. 404. Nor can an alien elect; 5 Munf. 127. And where land is directed to be sold, and the money divided among several, all must unite in an election to take the property in its original condition, or the conversion must be made; 1 Bro. C. C. 500. For the rule, which admits of this election, we are truly told, is “ a rule of equity not affecting the nature of the estate, but founded in the convenience of the parties. Why encounter the expense and trouble of a sale, and oblige the cestui que trust, if he wishes to hold the land, to purchase it in ? It is to avoid this circuity, that courts of equity permit him at once *429 to elect to hold the land.” But where the party cannot elect, or if he does, his election is void, the property must then pass “ as land or money, according to the stamp which was placed upon it by the will. It remains personal, in this case, until the time of election. If the legatee dies intestate the day after the testator, leaving a husband, and a child, the husband as her personal representative would take the bequest as personalty ; but having thus acquired a right to the money, he comes in, and elects to pay debts &c. and keep the land”—“it then, and not till then, becomes real estate, and that after having passed, in the first instance, as personalty.” Per Coalter, J. 5 Munf. 127, 8. Such is the clear and forcible language in which a former eminent judge of this court has stated the doctrines of the courts, in reference to these principles. It remains to observe upon this head, that a feme covert can only make a valid election under a commission from the court of chancery, directing her privy examination separate and apart from her husband; by analogy to the solemnities attending the levy of a fine in England, or the privy examination of a feme covert in Virginia. 1 Ves. jr. 512. 2 Ves. sen. 174. This subject however must be hereafter more closely examined, in its connexion with this case.
Such are the general principles of the rule in question. They are to be traced back to a respect for the will of the donor or testator, who has imposed upon his own property, in the distribution of his bounty, the character which seemed to him fit. Whatever that be which he has stamped upon it, that it must bear, until it is changed by the election of a party invested with the right, and capable of exercising the power, of election. To use the language of the cases, whatever character he has imperatively fixed upon it, that it must bear until changed. It was, indeed, at one time, decided, that there was no equity as between the heir and personal representative of the legatee, to change it after his death, from its actual state at that time; Walker v. Denne, 2 Ves. jr. 170. 176. But that case was soon questioned, *430 and has been since repeatedly overruled. And it is now distinctly understood, that where the character is imperatively fixed by the will, that character it must retain, unless some party having a right to elect, either expressly or by his acts, evinces a design to hold it in its original state.
Where, indeed, the change is not imperatively required, the property is permitted to retain that character which it actually has at the legatee’s death. Thus, if lands are directed to be sold and the proceeds laid out in personalty or in other lands, the conversion into personalty is not imperative, and the discretion vested in the trustee preserves the estate (until an actual sale has been made) in its original character of real estate.
After these views of the principles which are invoked as governing the case at bar, let us proceed to consider this case more particularly.
I am of opinion, that the will of Mrs. Alexander contains such an imperative direction to her trustees to sell the tract called Dunn's, as fixed imperatively upon that property, in the event that has happened (the failure of Mrs. Brooke to make the choice given her by the will) the character of personalty. What did the will direct ? That the land should be sold, and the money divided; but that if her daughter when married or of age, should choose, she might take the land in fee. If then, her daughter did not choose to take the land, the direction of the will, and the design of the testatrix, required that the conversion should be made. She commands it to. be done, unless the daughter should elect otherwise. If she did not elect, it was the trustee’s duty to sell, and particularly, if (as I think) her right of election was determined by her marriage. Upon what principle of equity, could their delay to fulfil the trust by selling the land, and paying over the money to the husband and niece, divest the former of his rights, and make that land, which they ought to have converted into money ? There was none; on the contrary, the principles of equity assure to the party his rights, notwithstanding the breach of *431 trust, by treating the property, though retaining its original ; 1 / ° form oi land, as personal estate.
Such appears to me to be clearly the state of the case, unless Mrs. Brooke did, by herself or her husband, make the election, which by the will she was impowered to make. That she did not elect, at any time, in her own person, is obvious. The contrary is not pretended. Whether her husband could elect for her, and did elect for her, are, therefore, the important questions to be examined.
He could not elect for her—1st, Because, according to the true construction of the will, the election was to have been made by her, at the time of her marriage. I concur with the appellant’s counsel, that the terms when married, designate the time when the election should be made, and not the situation in which' she might be. There was nothing in the situation of coverture, that was peculiarly calculated to fit her for election; since her will would then be under the influence of another, and she could not without the concurrence of that other, make an election, which would fix upon her, and by consequence upon him, a heavy charge. The election after marriage, would, in effect, have been a contract by which she would have assumed a personal responsibility (and he would of course have been also bound) for one half the valuation, however extravagant, to Huey T. Hooe; and Brooke, by this act of his wife, would not only have been deprived of his wife’s fortune in one half of the land, but have been charged with Miss Hoods fortune in the other half. Moreover, if the words when married, do not designate the time, but the condition, then she had time during the coverture to decide; and, in the interval, Miss Hoods interest in the estate would have been suspended, except as to the receipt of a portion of the rents; which never could have been designed, since her interest, at least, was explicitly made personal in every event. On the other hand, it was very natural that the mother, while providing that her daughter’s estate should be converted into money, as best suited for the fortune of a female, should allow her *432 the privilege of judging for herself, when of a proper age, and of taking the land, if she preferred it. What period was it natural to fix upon ? Maturity or full age, in the first place ; but, as her young and richly provided child might marry before that period, prudence also required, that she should have power at her marriage, to make an election changing her interest from money, which would go into the pocket of her husband, into lands which would be secure to herself, an election, which if demanded by prudence, it might confidently be supposed, her friends would urge upon her, before the right should be terminated forever by her marriage. 2ndly, If we suppose that the right to his wife’s interest in this property, did not vest in Brooke, immediately upon the marriage, by virtue of his marital rights, and that her right of election continued in her after marriage, that right could not have been exercised by him for her, but must have been exercised by herself under a commission from the court of chancery. 1 Ves. jr. 512. 2 Ves. sen. 174. A husband cannot elect to make the property of his wife, real or personal at his pleasure. If, for instance, money is directed to be laid out in land for the wife, the husband cannot elect to take the money, though she may do it under a commission, as has been already remarked. It seems to be supposed, indeed, that he might elect to take the interest as land, since that would be for her benefit. But, as has been well said, “ it is no power of election, if he could elect but one way.” Election implies choice; choice supposes more than a single object, either of which may be chosen. It is absurd to attribute to the husband a right of election in behalf of his wife, between two things, if he is only permitted to take one of them. He must have a right to take which he pleases, or he has no right of election at all. But he has no right, as has been decided, to make her property real or personal at pleasure, and therefore he has clearly, in her behalf, no right of election at all. 3rdly, Even though, in ordinary cases, this right existed in the husband, of electing for his wife, it might well be ques *433 tioned here. For, by this election, while he would take for her the fee simple in the land, he would, eodem flatu, have charged it with a heavy incumbrance, which, according to a very ordinary course of events, might have swallowed up the whole. This, I apprehend, cannot be pretended to have been within his power.
In the view I have taken of the subject, it is quite unnecessary to grope through the equivocal testimony in the cause, to discover, whether he acted for his wife or for himself, in the transaction with the executors. The taking the conveyance of the lands which Taliaferro gave him in exchange, to himself, proves his intention to act for himself, when that conveyance was made. Be this as it may, if the right was in her, no election by him could affect it, if it was in him, no mistake of his right could forfeit it. It remains only to see, what was the effect of Mrs. Brooke’s failure to make an election.
1. By the will, the legal title was devised to the executors in fee, subject to be divested by her election to take the land, upon which the legal title would have immediately shifted and been vested in her in fee. One only of the executors, John Taliaferro the elder, qualified as such; and in him all the rights and duties given by the will to the executors, were concentrated, by the operation of the statute 21 Hen. 8. ch. 4. which continued in force till January 1787, when our own statute of 1785, which superseded the english statute, took effect. 1 Rev. Code, ch. 104. § 52. p. 388.
2. Mrs. Brooke having failed to elect to take the land at the time of her marriage, I am of opinion, that the election given by the will, expired upon the marriage. From that moment, the direction to sell and convert the land into money, was imperative and unconditional, and irreversible by her. The character of money was given to her interest. It was personalty, and devolved on her husband, as a portion of his marital rights. And, though by the english law, if he had found it necessary to resort to equity ton enforce *434 the execution of the trust in his favour, he might have been compelled to make a settlement, yet that could only have been required upon the supposition that it was personalty, 1 Eq. ca. abr. 64. pi. 3. and in compliance with a rule which never has yet been acted on in Virginia, and about which I do not wish to be considered as giving an opinion. 1 Rand. 372. 385. By the marriage, then, without an election by Mrs. Brooke to take the land, the right vested absolutely in her husband.
3. Brooke being thus invested with the right to the proceeds of one half the' land, and having paid to Miss Hooe her portion, being the value of the other half, had a clear equity to the whole proceeds of sale, and, by consequence, a right to elect to take the land itself, in which he had thus acquired the intire interest, instead of having it sold, “ and being compelled to encounter the expense and trouble of a sale, and upon that sale to buy it in.” He did so. Whatever may have been the views and opinions of those who managed the transaction, it is sufficiently clear, that he, with the full possession of the equitable title, has, by an arrangement the fairness of which is not impeached, passed over that equitable title to the person having the command of the legal estate, and thus, by uniting the two, has vested in him a complete and valid title to the land.
To test this, let us see whether Brooke’s children have title, either legal or equitable. Their title is not legal, for I have shewn that the legal title could only vest in their mother, upon her election to take the land, which election was never made. Nor have they any equity; for the right to the money passed to their father, as a marital right, which they can never question. And this consequence would equally follow, it would seem, even though Mrs. Brooke’s right of election was only determined by her death. For, in that case, as she made no election in her lifetime, her interest, upon her death, would have devolved upon her husband as personalty, and his children would have had no title to demand it. The form of an administration might indeed *435 have been necessary to consummate' his legal rights, but, in substance, he would have been entitled to this interest as part of the personalty of his wife; and, at this late day, this court would not disturb the title for want of an adherence to such form.
Having thus arrived at the conclusion, that there is no valid objection to the title of Taliaferro under Brooke, to the Dunn’s■ tract of land, it is I think sufficiently obvious that an examination of the other questions made in the cause, can in no wise be necessary.
The decree is to be reversed, and the bill dismissed.