Lee, J.
The doctrine of “ constructive conversion” which has been somewhat discussed by the counsel has, I think, no application to the present case in the *256 sense in which it is usually accepted and applied by C0U1^S of equity, and with the incidents which attend in the view of those courts. The will in question here does not direct lands to be converted into money nor money into lands, but provides only for the con- . “ . x " version of a particular kind of personal property into money upon a supposed contingency which it specifies. Nor, as I shall endeavor to show hereafter, have the legatees for whom the benefit of that property is intended, any election in regard to the form in which •they shall enjoy it. If they can only take it¿ supposing that they can take it at all in the form of money, no right of election to take it in any other can be cast upon them. The decision of the cause must depend upon the construction which is to be placed upon the provisions of the will, and from this their legal operation and effect is to be deduced. To determine the construction then which the will is to receive we are to enquire what was the meaning and intention of the testator, and whether that intention, if the same can be ascertained, was lawful in any form which it might be made to assume consistently with the terms of the will. If the intention of the testator is sufficiently indicated, and if it can in any way under the provisions of the will be reconciled with the law and its policy, it must be fully effectuated. And although a particular mode which the testator may have pointed out for carrying his wishes into effect be found impracticable or illegal, yet if he have also indicated another and alternative mode which is practicable and legal, his intention shall be carried into effect by means of the latter. And where the general intent of the testator can be seen, it must be carried into effect as far as it can be if it cannot take effect to the full extent; and this though it may be at the expense of the particular intent which cannot be effectuated because the testator has attempted to give it effect in a way not *257 permitted by the law. Ram on Wills, ch. 13; 2 Lomax Ex’ors 6, 11; 2 Jarm. Wills 528; Pitt v. Jackson, 2 Bro. C. C. 51; Thelusson v. Woodford, 4 Ves. R. 227, 325; Humberston v. Humberston, 1 P. Wms. 332; Chapman v. Brown, 3 Burr. R. 1626; Find ay v. Riddle, 3 Binn. R. 139, 162; Bartlett v. King, 12 Mass. R. 537; Inglis v. The Trustees of Sailor’s Snug Harbor, 3 Peters’ R. 99; Literary Fund v. Dawson, 10 Leigh 147.
Now in this case the general intent of the testator is perfectly apparent and unmistakable. It was that the three free negro women, Frankey, Ann and Laurena should have the benefit of his whole estate real and personal including his slaves, excepting the piece of land given to the children of Edwin Harrison and so much more of his estate as would be necessary for their support and maintenance. He gives to each of these women a tract of land described in the will; to the woman Frankey an annuity of six hundred dollars during her life, and to Laurena and Ann, each, an annuity of two hundred and fifty dollars, during their lives respectively, unless they should be required by some law to leave the state; and in that event they were to receive, each, the sum of two hundred and fifty dollars in lieu of the annuities. He gives to them also all his household and kitchen furniture. He then directs that his executors shall hold all the residue of his estate as trustees for the support and maintenance of the same three women and the children of Ann and Laurena, free from liability for the debts of the husbands of the two last named; and in the event of their being required to leave the state, he directs the residue to be equally divided amongst the same three women. And the next clause of the same item (to which I shall advert more particularly hereafter) shows that he expressly designed his slaves to be embraced in the devise of the residue, and that the wo *258 men named should have the benefit of that species of property belonging to him as well as of the real estate and annuities previously given.
It is very manifest then that the testator intended the three women named should have the enjoyment of his whole estate (excepting the portion set apart for the children of Edwin Harrison), including his slaves. This was the general intent. Coming to the particular intent and the mode in which it was to be enjoyed, it was his will and desire that it should be held by his executors as trustees for their support and that of the children of Ann and Laurena. Now by our statute it is expressly provided that no free negro shall be capable of acquiring (except by descent) any slave other than the husband, wife, parent or descendant of such free negro. Code, ch. 104, § 4, p. 458. And I cannot concur with the counsel who has argued that although a free negro may not take slaves by devise directly, yet that he may take the use of slaves the legal title to which is devised to a white person in trust for his benefit. What the free negro cannot take directly he cannot be permitted to take indirectly; and I consider that it would be as much in violation of the spirit and policy of the law to permit the free negro to have a property in the trust in such a case as it would be against its letter for him to hold the slaves in his own right under a direct bequest. Such a trust would be equivalent to the legal ownership governed by the same rules and subject to the same charges. Per Roane, J., Commonwealth v. Martin's ex'ors, 5 Munf. 117, 143; Bass v. Scott, 2 Leigh 356. And per Tucker, P., Hubbard v. Goodwin, 3 Leigh 492, 515. The disability of the free negro in this respect may be likened to that of the slave to acquire property in any thing; and the latter can no more acquire a property by way of trust than he can take the legal estate in the subject. Trotter v. Blocher, 6 Port. R. 269. See also *259 Smith's adm'r v. Betty, &c., 11 Gratt. 752. And it somewhat resembles that of an alien as to real estate who cannot take by devise whether made directly by way of a trust. Hubbard v. Goodwin, 3 Leigh 492. And if the case rested here, I should feel little hesitation in saying that the gift of the trust in the slaves to the three free negroes was of no more validity than a direct gift of the slaves themselves, and that the bequest must therefore fail, and the testator be declared intestate as to the slaves. But this is not all. The testator proceeds in the same (the 11th) item of his will to declare that “ should it be necessary in carrying out this clause of my will, to sell my slaves, I desire my executors to sell them privately or publicly as may seem to them best, selecting them good homes and good masters.” Now although the legatees because of their status could not take the slaves either directly or by means of a trust, there is nothing in the law or its policy to forbid their taking their value in money. They are permitted to acquire and hold all other kinds of property, and may take even slaves by descent, or by purchase where the purchaser stands in one of the relations to the slave specified in the statute. To deny the general power to acquire slaves was as far as the legislature thought proper to go. It was never intended to forbid the free negro to take the value of slaves in money or other property. We have then the case of an alternative provision in a will by which the testator has taken eare that his general intent shall be carried into effect in some form if that which he had already indicated, and which he no doubt preferred, should for any cause be found impracticable. To this surely there can be no just objection. Alternative provisions in wills to provide for the failure of the principal bequests are of very common occurrence. We have an instance in the case already cited of the Literary Fund v. Dawson, 10 Leigh 147. There the *260 testator provided for the failure of the devise contained *n ^ie sixteenth clause of his will, by directing in the another and different disposition of the same property devised in the sixteenth. And the sixteenth clause being declared void by reason of the uncertainty of the beneficiaries, the seventeenth was set J up and the disposition of the subject made thereby directed to be carried into effect. So in the case of Inglis v. The Trustees of Sailor’s Snug Harbor, 3 Peters R. 99, already cited, it was held that although the intention of the testator could not be carried inte effect in the mode first contemplated, yet that there was an alternative provision which with the aid of an act of the legislature, would remove the difficulty and give effect to the general intent, in this case the beneficiaries cannot take the subject intended for them in the form of slave property, either direetly or by way of trust. But the testator has also provided that if a sale of the slaves shall be necessary in oi'der to give effect to his intention, they shall be sold. Why then shall his intention not be effectuated by a sale of the slaves and a division of the proceeds, in a form in which they can take, among the objects of his bounty ? It is said that it would be violative of the policy of the law to divide the proceeds of the sale of slaves amongst free negroes; and it might be contended I presume with equal force that the annuities given by the will would also be void because the estate would be insufficient to pay them without a resort to the slaves. I cannot concur in this reasoning'. I do not see how the policy of the law is interfered with by suffering the free negroes to take the money arising-from the sale of the slaves. The object of the law is .probably to keep slaves as far as possible under the control of white men only, and prevent free negroes from holding persons of their own race and color in personal subjection to themselves. Perhaps also it in-
*261 tended to evince the distinctive superiority of the white race. To forbid free negroes from taking money by bequest because it may have come from a sale the slaves of the testator could not, that I can see, promote the object had in view, nor can I see any such prohibition in the law or its policy. The case decided by Judge Robertson as stated by the counsel differed materially from the case before us. There was a devise of slaves directly to a free negro, but there was no alternative provision in case the former could not be carried into effect. The devise was simply and absolutely void, and the free negro could take nothing under it whatever; and therefore although the slaves were sold for payment of debts and there was a surplus, the free negro could not claim under a void devise. Here, the right to the proceeds does not depend upon a void provision, but upon one which is rendered fully effectual as to the slaves by the plain direction to the executors to' convert them into a form in which the beneficiaries may lawfully take the benefit of the devise.
But it is said that the necessity to sell which the testator had in mind, was not to overcome the disability of the free negroes to take the slaves as such, but that which might be found to exist for the purpose of paying debts or to make an equal division of the property among the three women in the event of their being required to leave the state. It could hardly have been to provide for a deficiency to meet the debts. The testator could scarcely have been ignorant that it was unnecessary to give authority to his executors to sell his slaves or a part of them, if the debts rendered it necessary, and the direction is not for sale of such part of the slaves as might be necessary to meet a deficiency of the other assets; the language is “to sell my slaves,” evidently meaning the whole. The sale he was contemplating was a sale *262 that might be found necessary “ in carrying out this' °^ause” of the will, and in that clause no allusion is made to his debts. Nor is there any suffic^er-d reason for restricting the meaning of the testator to the necessity of a sale for the purpose of making L ° partition if the free negroes should be required to leave the state. In point of fact there would be no absolute necessity for a sale if those persons did leave the state, because their respective shares might still be held by the trustees for their benefit and the profits accounted for to them, though in that event it certainly would have been much more convenient, and the testator may have designed that they should be sold. But he did not mean only in that event. If he had so intended why not say “And should said women be required to leave the state, then I desire my executors to sell my slaves &c.” His language is “And should it be necessary in carrying out this clause of my will &c.” He did not mean by the term “ cláuse”'drily that sentence in which he spoke of the women being required to leave the state, but evidently meant the whole* eleventh item or article of his will. That suehyWas the sense in which he used that word is I think peifectly clear, and it is of little importance to enquire what may be its exact philological signification.
The act forbidding the acquisition of slaves by free negroes passed in 1832, and the testator may or may not have known there was such a law. That he bequeathed his slaves to trustees for the benefit of the three women instead of giving them directly is not conclusive that he knew of this law or meant to evade its provisions. For he gave all the residue of his estate as well as the slaves to the trustees for the same purpose, and the slaves are given as part of the residue. But if, as is most probable, he did know there was such a law, he might have supposed that although *263 he could not give the slaves directly, yet that the law did not intend to prohibit a gift to white persons as trustees who should hold the legal title to the slaves and have the personal control of them but should give to the free negroes designed to be the objects of his 0 0 . J bounty, the benefit and profits of their labor. Nor can it be a matter of surprise if he should have so thought, when as we have seen, counsel learned in the law have argued with earnestness and ingenuity that such is the true construction of the statute. He might very well have had doubts upon this point, and surely it may be permitted to a testator under such circumstances to guard against his possible mistake or ignorance of the law by providing some other mode in which those who were the objects of his bounty might enjoy what he desired to give if that which he preferred should prove to be impracticable or illegal. Indeed the most unbounded indulgence has been shown by the courts to the ignorance, unskillfi gence of testators, and judges have selves astute in averting their effec regarded as inops consilii, and every made for his want of better knowled law as well as those of gramma Where he may have obscured his mea flicting expressions, his intention is to be sought rather in a rational and consistent than an irrational and inconsistent purpose. And if the will may admit of more than one construction that is to be preferred which will render it valid and effectual, ut res magis valeat quam pereat. 1 Jarm. Wills 318; Jenkins v. Herries, 4 Madd. R. 67; Ram. on Wills (8 Law Lib.), ch. 4, p. 42; 2 Jarm. Wills 522, 526.
But whether the testator knew of the existence of this law and attempted to evade its provisions, or not, or whether he had in mind the possibility of a sale being necessary to enable the free negroes to enjoy his *264 bounty or not, are matters of very little importance. That he might have attempted to dispose of his property in a mode not sanctioned by the law, is no reason why he should not be allowed to dispose of it in a manner that the law will sanction, if he has taken care to insert a provision which majr have that effect. Nor is it material what may have been the necessity for a sale that crossed his mind when he made the provision in question, or whether he may have thought such necessity might arise from different causes, or whether in fact it may exist for more reasons than one. He has used language broad enough and sti’ong enough to embrace the necessity for such a sale arising from the total and absolute disability of the beneficiaries to take the bounty intended for them by any other means or in any other mode. And certainly there could be no more urgent and imperious necessity for a sale than that arising from such disability; and although the will does not say in totidem verbis that in case of such necessity the executors shall sell and divide the proceeds amongst these residuary legatees, yet such is the necessary and inevitable implication from the language employed, and no express provision to that effect could render the intention clearer.
But it is asked who is to judge of the necessity and when and how it is to arise ? And it is said the executors might collude with the free negroes to evade the law by holding the slaves on the pretence that they were converted into money and that there will be no one interested to sue and carry out the policy of the law.
It is the'duty of the executors to construe the will and carry out the intention of the testator by selling the negroes and applying the proceeds as he has directed, as they cannot lawfully do so in any other mode. They were authorized and it was their duty to sell the slaves at once as the will in effect required *265 an immediate sale in order to carry the intention of the testator into effect. But to meet the exigencies of the will equity will if necessary regard the slaves as absolutely converted into money and will deny to the legatees any election in the matter. The doctrine is inapplicable to the case because the free negroes are incapable of taking the slaves and no election is to be forced on a party for the purpose of creating a forfeiture. Foone v. Blount, Cowp. R. 464; Walker v. Denne, 2 Ves. jr. R. 170; Commonwealth v. Martin's ex'ors, 5 Munf. 117, 127, per Coalter, J.; Hubbard v. Goodwin, 3 Leigh 492, 513, Judge Tucker’s opinion; Craig v. Leslie, 3 Wheat. R. 563. The first of these cases involved the right of a creditor who was a papist to have payment of his debt against the testatrix out of the proceeds of real estate directed to be sold by the will for payment of debts, and the last three concerned the rights of aliens in respect of real estate, but they furnish an illustration by analogy bearing strongly upon the rights of the legatees under the will in this case. If the executors entertained doubts as to the true construction of the will it was their right and their duty to apply to the proper court to construe the will for them and direct them in the discharge of their duties. If they have failed in their duty in this respect it should not impair the rights of the legatees who could themselves demand that a sale be made if improperly delayed by the executors. That the executors might continue to hold the slaves in violation of the policy of the law would certainly be a breach of duty on their part but it will not help the argument here. The most it would prove is that the legislature had failed to provide adequate sanctions to enforce its prohibition to free negroes to acquire this species of property. It does not furnish any reason why the will of the testator should be defeated when he has plainly pointed out a mode by which it may *266 lawfully be carried into effect, because the executors clloose 1° violate their duty.
Following then the rational and well settled rules to which reference has been already made, and, looking to the manifest general intent of the testator, I think , , „ ,, . ,, ., that the sentence oí the eleventh item m question should be interpreted as if it read, “ and should it be necessary in carrying out this clause of my will, to sell my slaves because my said legatees cannot lawfully have the benefit of them except by means of a sale and conversion of the same into money, or for any other cause, I desire my executors to sell them publicly or privately, &c.and that the residuary devise in the will was good to pass to the legatees the proceeds of the sale of the slaves after providing (if necessary to apply the same or part thereof to that purpose) for the debts due and the annuities previously given.
The only remaining question relates to the interest or quantum, of estate that the legatees take in this subject. It is said that after providing for debts and the annuities and for the support and maintenance of the legatees, there will be a surplus not disposed of and which will pass to the next of kin.
It is to be observed that the eleventh item or clause of the will is a residuary clause by which the whole residue of the estate is given to the executors as trustees for the benefit of the parties named; and it is a well settled rule that where a residue is given every presumption is to be made that the testator did not intend to die intestate as to any part of his estate. Philipps v. Chamberlaine, 4 Ves. R. 51; 2 Rop. Leg. 1461. And where the interest or profits of the subject are given to or in trust for a legatee or for the separate use of a legatee, without limitation0 as to continuance, the principal or corpus will be considered, as bequeathed also unless from the nature of the subject or *267 the context of the will, the interest or produce only was plainly intended. 2 Lomax Ex’ors 71; Elton v. Sheppard, 1 Bro. C. C. 532; Philipps v. Chamberlaine, ubi sup. Rawlins v. Jennings, 13 Ves. R. 39; Adamson v. Armitage, 19 Ves. R. 411. In the case last cited la Sir William Grant -said, “ In the case of personalty words of qualification are required to restrain the extent and duration of the interest. Prima facie a gift of the produce of a fund is a gift of that produce in perpetuity, and is consequently a gift of the fund itself.” But the expression of a particular purpose for which the gift is made will not operate as a condition or limitation of the bequest. The fund being appropriated to the benefit of the legatee the particular mode in which it is to be applied is but a secondary object and does not enter into the substance of the gift. 2 Lomax Ex’ors 73; 1 Rop. Leg. 430; Barlow v. Grant, 1 Vern. R. 255; Nevill v. Nevill, 2 Vern. R. 431; Barton v. Cooke, 5 Ves. R. 461. Per Carr, J., Rowlett v. Rowlett’s ex’ors, 5 Leigh 20, 28. So by Sir Lancelot Shadwell where there was a gift for the maintenance and education of the legatee, it was held to be an absolute gift. Webb v. Kelly, 9 Simons R. 470. And if the interest of a fund be -directed to be applied to the education of legatees and there prove to be a surplus beyond the expenses of education, that surplus will belong to those for whose education it was intended to be applied. Rowlett v. Rowlett’s ex’ors, ubi supra.
Now we have here the case of a residuary bequest for the support and maintenance of the legatees, and there is nothing either in the nature of the subject or in the context of the will to show that the gift was intended to be restricted to the interest or produce of the fund. On the contrary the plain implication is that the whole is intended to be given to the legatees. That the purpose’was avowed to be for maintenance *268 and support is as we have seen but a secondary consideration and does not enter into the substance of the gift. And I think it clear that it must be regarded as an absolute gift of the entire estate, subject of course to debts and the annuities previously given. Whether the children mentioned take along with their mother or in remainder after her death, whether children after born or only those living at the death of the testator were to take and whether the testator intended by the clause in which he looked to the event of the legatees being required to leave the state to create any new or different estate from that which he had intended in the previous clause, are all questions with which the appellants here have no concern, and which it is neither necessary nor proper should be decided in this case. Whatever may be their solution the estate is equally given away from the next of kin.
I think that the Circuit court did not err in dismissing the bill, and am of opinion to affirm the decree.
The other judges concurred in the opinion of Lee , J.
Decree affirmed.